## BRANDENBURG *v.* OHIO.

No. 492.   Argued February 27, 1969.—Decided June 9, 1969.

*Allen Brown* argued the cause for appellant.   With him on the briefs were *Norman Dorsen, Melvin L. Wulf, Eleanor Holmes Norton,* and *Bernard A. Berkman.*

*Leonard Kirschner* argued the cause for appellee. With him on the brief was *Melvin G. Rueger.*

*Paul W. Brown,* Attorney General of Ohio, *pro se,* and *Leo J. Conway,* Assistant Attorney General, filed a brief for the Attorney General as *amicus curiae.*

PER CURIAM.

The appellant, a leader of a Ku Klux Klan group, was convicted under the Ohio Criminal Syndicalism statute for "advocat[ing] . . . the duty, necessity, or propriety

of crime, sabotage, violence, or unlawful methods of terrorism as a means of accomplishing industrial or political reform" and for "voluntarily assembl[ing] with any society, group, or assemblage of persons formed to teach or advocate the doctrines of criminal syndicalism." Ohio Rev. Code Ann. § 2923.13. He was fined $1,000 and sentenced to one to 10 years' imprisonment. The appellant challenged the constitutionality of the criminal syndicalism statute under the First and Fourteenth Amendments to the United States Constitution, but the intermediate appellate court of Ohio affirmed his conviction without opinion. The Supreme Court of Ohio dismissed his appeal, *sua sponte*, "for the reason that no substantial constitutional question exists herein." It did not file an opinion or explain its conclusions. Appeal was taken to this Court, and we noted probable jurisdiction. 393 U. S. 948 (1968). We reverse.

The record shows that a man, identified at trial as the appellant, telephoned an announcer-reporter on the staff of a Cincinnati television station and invited him to come to a Ku Klux Klan "rally" to be held at a farm in Hamilton County. With the cooperation of the organizers, the reporter and a cameraman attended the meeting and filmed the events. Portions of the films were later broadcast on the local station and on a national network.

The prosecution's case rested on the films and on testimony identifying the appellant as the person who communicated with the reporter and who spoke at the rally. The State also introduced into evidence several articles appearing in the film, including a pistol, a rifle, a shotgun, ammunition, a Bible, and a red hood worn by the speaker in the films.

One film showed 12 hooded figures, some of whom carried firearms. They were gathered around a large wooden cross, which they burned. No one was present

other than the participants and the newsmen who made the film. Most of the words uttered during the scene were incomprehensible when the film was projected, but scattered phrases could be understood that were derogatory of Negroes and, in one instance, of Jews.[1] Another scene on the same film showed the appellant, in Klan regalia, making a speech. The speech, in full, was as follows:

"This is an organizers' meeting. We have had quite a few members here today which are—we have hundreds, hundreds of members throughout the State of Ohio. I can quote from a newspaper clipping from the Columbus, Ohio Dispatch, five weeks ago Sunday morning. The Klan has more members in the State of Ohio than does any other organization. We're not a revengent organization, but if our President, our Congress, our Supreme Court, continues to suppress the white, Caucasian race, it's possible that there might have to be some revengeance taken.

"We are marching on Congress July the Fourth, four hundred thousand strong. From there we are dividing into two groups, one group to march on St. Augustine, Florida, the other group to march into Mississippi. Thank you."

[1] The significant portions that could be understood were:
"How far is the nigger going to—yeah."
"This is what we are going to do to the niggers."
"A dirty nigger."
"Send the Jews back to Israel."
"Let's give them back to the dark garden."
"Save America."
"Let's go back to constitutional betterment."
"Bury the niggers."
"We intend to do our part."
"Give us our state rights."
"Freedom for the whites."
"Nigger will have to fight for every inch he gets from now on."

The second film showed six hooded figures one of whom, later identified as the appellant, repeated a speech very similar to that recorded on the first film. The reference to the possibility of "revengeance" was omittted, and one sentence was added: "Personally, I believe the nigger should be returned to Africa, the Jew returned to Israel." Though some of the figures in the films carried weapons, the speaker did not.

The Ohio Criminal Syndicalism Statute was enacted in 1919. From 1917 to 1920, identical or quite similar laws were adopted by 20 States and two territories. E. Dowell, A History of Criminal Syndicalism Legislation in the United States 21 (1939). In 1927, this Court sustained the constitutionality of California's Criminal Syndicalism Act, Cal. Penal Code §§ 11400–11402, the text of which is quite similar to that of the laws of Ohio. *Whitney* v. *California,* 274 U. S. 357 (1927). The Court upheld the statute on the ground that, without more, "advocating" violent means to effect political and economic change involves such danger to the security of the State that the State may outlaw it. Cf. *Fiske* v. *Kansas,* 274 U. S. 380 (1927). But *Whitney* has been thoroughly discredited by later decisions. See *Dennis* v. *United States,* 341 U. S. 494, at 507 (1951). These later decisions have fashioned the principle that the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action.[2] As we

[2] It was on the theory that the Smith Act, 54 Stat. 670, 18 U. S. C. § 2385, embodied such a principle and that it had been applied only in conformity with it that this Court sustained the Act's constitutionality. *Dennis* v. *United States,* 341 U. S. 494 (1951). That this was the basis for *Dennis* was emphasized in *Yates* v. *United States,* 354 U. S. 298, 320–324 (1957), in which the Court overturned con-

said in *Noto* v. *United States,* 367 U. S. 290, 297–298 (1961), "the mere abstract teaching . . . of the moral propriety or even moral necessity for a resort to force and violence, is not the same as preparing a group for violent action and steeling it to such action." See also *Herndon* v. *Lowry,* 301 U. S. 242, 259–261 (1937); *Bond* v. *Floyd,* 385 U. S. 116, 134 (1966). A statute which fails to draw this distinction impermissibly intrudes upon the freedoms guaranteed by the First and Fourteenth Amendments. It sweeps within its condemnation speech which our Constitution has immunized from governmental control. Cf. *Yates* v. *United States,* 354 U. S. 298 (1957); *De Jonge* v. *Oregon,* 299 U. S. 353 (1937); *Stromberg* v. *California,* 283 U. S. 359 (1931). See also *United States* v. *Robel,* 389 U. S. 258 (1967); *Keyishian* v. *Board of Regents,* 385 U. S. 589 (1967); *Elfbrandt* v. *Russell,* 384 U. S. 11 (1966); *Aptheker* v. *Secretary of State,* 378 U. S. 500 (1964); *Baggett* v. *Bullitt,* 377 U. S. 360 (1964).

Measured by this test, Ohio's Criminal Syndicalism Act cannot be sustained. The Act punishes persons who "advocate or teach the duty, necessity, or propriety" of violence "as a means of accomplishing industrial or political reform"; or who publish or circulate or display any book or paper containing such advocacy; or who "justify" the commission of violent acts "with intent to exemplify, spread or advocate the propriety of the doctrines of criminal syndicalism"; or who "voluntarily assemble" with a group formed "to teach or advocate the doctrines of criminal syndicalism." Neither the indictment nor the trial judge's instructions to the jury in any way refined the statute's bald definition of the crime

---

victions for advocacy of the forcible overthrow of the Government under the Smith Act, because the trial judge's instructions had allowed conviction for mere advocacy, unrelated to its tendency to produce forcible action.

in terms of mere advocacy not distinguished from incitement to imminent lawless action.[3]

Accordingly, we are here confronted with a statute which, by its own words and as applied, purports to punish mere advocacy and to forbid, on pain of criminal punishment, assembly with others merely to advocate the described type of action.[4]  Such a statute falls within the condemnation of the First and Fourteenth Amendments.  The contrary teaching of *Whitney* v. *California, supra,* cannot be supported, and that decision is therefore overruled.

*Reversed.*

MR. JUSTICE BLACK, concurring.

I agree with the views expressed by MR. JUSTICE DOUGLAS in his concurring opinion in this case that the "clear and present danger" doctrine should have no place

---

[3] The first count of the indictment charged that appellant "did unlawfully by word of mouth advocate the necessity, or propriety of crime, violence, or unlawful methods of terrorism as a means of accomplishing political reform . . . ."  The second count charged that appellant "did unlawfully voluntarily assemble with a group or assemblage of persons formed to advocate the doctrines of criminal syndicalism . . . ."  The trial judge's charge merely followed the language of the indictment.  No construction of the statute by the Ohio courts has brought it within constitutionally permissible limits. The Ohio Supreme Court has considered the statute in only one previous case, *State* v. *Kassay,* 126 Ohio St. 177, 184 N. E. 521 (1932), where the constitutionality of the statute was sustained.

[4] Statutes affecting the right of assembly, like those touching on freedom of speech, must observe the established distinctions between mere advocacy and incitement to imminent lawless action, for as Chief Justice Hughes wrote in *De Jonge* v. *Oregon, supra,* at 364: "The right of peaceable assembly is a right cognate to those of free speech and free press and is equally fundamental."  See also *United States* v. *Cruikshank,* 92 U. S. 542, 552 (1876); *Hague* v. *CIO,* 307 U. S. 496, 513, 519 (1939); *NAACP* v. *Alabama ex rel. Patterson,* 357 U. S. 449, 460–461 (1958).

in the interpretation of the First Amendment.  I join the Court's opinion, which, as I understand it, simply cites *Dennis* v. *United States,* 341 U. S. 494 (1951), but does not indicate any agreement on the Court's part with the "clear and present danger" doctrine on which *Dennis* purported to rely.

Mr. Justice Douglas, concurring.

While I join the opinion of the Court, I desire to enter a *caveat.*

The "clear and present danger" test was adumbrated by Mr. Justice Holmes in a case arising during World War I—a war "declared" by the Congress, not by the Chief Executive.  The case was *Schenck* v. *United States,* 249 U. S. 47, 52, where the defendant was charged with attempts to cause insubordination in the military and obstruction of enlistment.  The pamphlets that were distributed urged resistance to the draft, denounced conscription, and impugned the motives of those backing the war effort.  The First Amendment was tendered as a defense.  Mr. Justice Holmes in rejecting that defense said:

> "The question in every case is whether the words used are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils that Congress has a right to prevent.  It is a question of proximity and degree."

*Frohwerk* v. *United States,* 249 U. S. 204, also authored by Mr. Justice Holmes, involved prosecution and punishment for publication of articles very critical of the war effort in World War I.  *Schenck* was referred to as a conviction for obstructing security "by words of persuasion."  *Id.,* at 206.  And the conviction in *Frohwerk* was sustained because "the circulation of the paper was

in quarters where a little breath would be enough to kindle a flame." *Id.,* at 209.

*Debs* v. *United States,* 249 U. S. 211, was the third of the trilogy of the 1918 Term. Debs was convicted of speaking in opposition to the war where his "opposition was so expressed that its natural and intended effect would be to obstruct recruiting." *Id.,* at 215.

> "If that was intended and if, in all the circumstances, that would be its probable effect, it would not be protected by reason of its being part of a general program and expressions of a general and conscientious belief." *Ibid.*

In the 1919 Term, the Court applied the *Schenck* doctrine to affirm the convictions of other dissidents in World War I. *Abrams* v. *United States,* 250 U. S. 616, was one instance. Mr. Justice Holmes, with whom Mr. Justice Brandeis concurred, dissented. While adhering to *Schenck,* he did not think that on the facts a case for overriding the First Amendment had been made out:

> "It is only the present danger of immediate evil or an intent to bring it about that warrants Congress in setting a limit to the expression of opinion where private rights are not concerned. Congress certainly cannot forbid all effort to change the mind of the country." *Id.,* at 628.

Another instance was *Schaefer* v. *United States,* 251 U. S. 466, in which Mr. Justice Brandeis, joined by Mr. Justice Holmes, dissented. A third was *Pierce* v. *United States,* 252 U. S. 239, in which again Mr. Justice Brandeis, joined by Mr. Justice Holmes, dissented.

Those, then, were the World War I cases that put the gloss of "clear and present danger" on the First Amendment. Whether the war power—the greatest leveler of them all—is adequate to sustain that doctrine is debat-

able. The dissents in *Abrams, Schaefer,* and *Pierce* show how easily "clear and present danger" is manipulated to crush what Brandeis called "[t]he fundamental right of free men to strive for better conditions through new legislation and new institutions" by argument and discourse (*Pierce* v. *United States, supra,* at 273) even in time of war. Though I doubt if the "clear and present danger" test is congenial to the First Amendment in time of a declared war, I am certain it is not reconcilable with the First Amendment in days of peace.

The Court quite properly overrules *Whitney* v. *California,* 274 U. S. 357, which involved advocacy of ideas which the majority of the Court deemed unsound and dangerous.

Mr. Justice Holmes, though never formally abandoning the "clear and present danger" test, moved closer to the First Amendment ideal when he said in dissent in *Gitlow* v. *New York,* 268 U. S. 652, 673:

> "Every idea is an incitement. It offers itself for belief and if believed it is acted on unless some other belief outweighs it or some failure of energy stifles the movement at its birth. The only difference between the expression of an opinion and an incitement in the narrower sense is the speaker's enthusiasm for the result. Eloquence may set fire to reason. But whatever may be thought of the redundant discourse before us it had no chance of starting a present conflagration. If in the long run the beliefs expressed in proletarian dictatorship are destined to be accepted by the dominant forces of the community, the only meaning of free speech is that they should be given their chance and have their way."

We have never been faithful to the philosophy of that dissent.

The Court in *Herndon* v. *Lowry,* 301 U. S. 242, overturned a conviction for exercising First Amendment rights to incite insurrection because of lack of evidence of incitement. *Id.,* at 259–261. And see *Hartzel* v. *United States,* 322 U. S. 680. In *Bridges* v. *California,* 314 U. S. 252, 261–263, we approved the "clear and present danger" test in an elaborate dictum that tightened it and confined it to a narrow category. But in *Dennis* v. *United States,* 341 U. S. 494, we opened wide the door, distorting the "clear and present danger" test beyond recognition.[1]

In that case the prosecution dubbed an agreement to teach the Marxist creed a "conspiracy." The case was submitted to a jury on a charge that the jury could not convict unless it found that the defendants "intended to overthrow the Government 'as speedily as circumstances would permit.'" *Id.,* at 509–511. The Court sustained convictions under that charge, construing it to mean a determination of "'whether the gravity of the "evil," discounted by its improbability, justifies such invasion of free speech as is necessary to avoid the danger.'"[2] *Id.,* at 510, quoting from *United States* v. *Dennis,* 183 F. 2d 201, 212.

Out of the "clear and present danger" test came other offspring. Advocacy and teaching of forcible overthrow of government as an abstract principle is immune from prosecution. *Yates* v. *United States,* 354 U. S. 298, 318. But an "active" member, who has a guilty knowledge and intent of the aim to overthrow the Government

---

[1] See McKay, The Preference For Freedom, 34 N. Y. U. L. Rev. 1182, 1203–1212 (1959).

[2] See *Feiner* v. *New York,* 340 U. S. 315, where a speaker was arrested for arousing an audience when the only "clear and present danger" was that the hecklers in the audience would break up the meeting.

by violence, *Noto* v. *United States,* 367 U. S. 290, may be prosecuted. *Scales* v. *United States,* 367 U. S. 203, 228. And the power to investigate, backed by the powerful sanction of contempt, includes the power to determine which of the two categories fits the particular witness. *Barenblatt* v. *United States,* 360 U. S. 109, 130. And so the investigator roams at will through all of the beliefs of the witness, ransacking his conscience and his innermost thoughts.

Judge Learned Hand, who wrote for the Court of Appeals in affirming the judgment in *Dennis,* coined the "not improbable" test, 183 F. 2d 201, 214, which this Court adopted and which Judge Hand preferred over the "clear and present danger" test. Indeed, in his book, The Bill of Rights 59 (1958), in referring to Holmes' creation of the "clear and present danger" test, he said, "I cannot help thinking that for once Homer nodded."

My own view is quite different. I see no place in the regime of the First Amendment for any "clear and present danger" test, whether strict and tight as some would make it, or free-wheeling as the Court in *Dennis* rephrased it.

When one reads the opinions closely and sees when and how the "clear and present danger" test has been applied, great misgivings are aroused. First, the threats were often loud but always puny and made serious only by judges so wedded to the *status quo* that critical analysis made them nervous. Second, the test was so twisted and perverted in *Dennis* as to make the trial of those teachers of Marxism an all-out political trial which was part and parcel of the cold war that has eroded substantial parts of the First Amendment.

Action is often a method of expression and within the protection of the First Amendment.

Suppose one tears up his own copy of the Constitution in eloquent protest to a decision of this Court. May he be indicted?

Suppose one rips his own Bible to shreds to celebrate his departure from one "faith" and his embrace of atheism. May he be indicted?

Last Term the Court held in *United States* v. *O'Brien,* 391 U. S. 367, 382, that a registrant under Selective Service who burned his draft card in protest of the war in Vietnam could be prosecuted. The First Amendment was tendered as a defense and rejected, the Court saying:

> "The issuance of certificates indicating the registration and eligibility classification of individuals is a legitimate and substantial administrative aid in the functioning of this system. And legislation to insure the continuing availability of issued certificates serves a legitimate and substantial purpose in the system's administration." 391 U. S., at 377–378.

But O'Brien was not prosecuted for not having his draft card available when asked for by a federal agent. He was indicted, tried, and convicted for burning the card. And this Court's affirmance of that conviction was not, with all respect, consistent with the First Amendment.

The act of praying often involves body posture and movement as well as utterances. It is nonetheless protected by the Free Exercise Clause. Picketing, as we have said on numerous occasions, is "free speech plus." See *Bakery Drivers Local* v. *Wohl,* 315 U. S. 769, 775 (DOUGLAS, J., concurring); *Giboney* v. *Empire Storage Co.,* 336 U. S. 490, 501; *Hughes* v. *Superior Court,* 339 U. S. 460, 465; *Labor Board* v. *Fruit Packers,* 377 U. S. 58, 77 (BLACK, J., concurring), and *id.,* at 93 (HARLAN, J., dissenting); *Cox* v. *Louisiana,* 379 U. S. 559, 578 (opinion of BLACK, J.); *Food Employees* v. *Logan Plaza,* 391 U. S. 308, 326 (DOUGLAS, J., concurring). That means that it can be regulated when it comes to the "plus" or "action" side of the protest. It can be regulated as to

the number of pickets and the place and hours (see *Cox v. Louisiana, supra*), because traffic and other community problems would otherwise suffer.

But none of these considerations are implicated in the symbolic protest of the Vietnam war in the burning of a draft card.

One's beliefs have long been thought to be sanctuaries which government could not invade. *Barenblatt* is one example of the ease with which that sanctuary can be violated. The lines drawn by the Court between the criminal act of being an "active" Communist and the innocent act of being a nominal or inactive Communist mark the difference only between deep and abiding belief and casual or uncertain belief. But I think that all matters of belief are beyond the reach of subpoenas or the probings of investigators. That is why the invasions of privacy made by investigating committees were notoriously unconstitutional. That is the deep-seated fault in the infamous loyalty-security hearings which, since 1947 when President Truman launched them, have processed 20,000,000 men and women. Those hearings were primarily concerned with one's thoughts, ideas, beliefs, and convictions. They were the most blatant violations of the First Amendment we have ever known.

The line between what is permissible and not subject to control and what may be made impermissible and subject to regulation is the line between ideas and overt acts.

The example usually given by those who would punish speech is the case of one who falsely shouts fire in a crowded theatre.

This is, however, a classic case where speech is brigaded with action. See *Speiser* v. *Randall*, 357 U. S. 513, 536–537 (DOUGLAS, J., concurring). They are indeed inseparable and a prosecution can be launched for the overt

acts actually caused. Apart from rare instances of that kind, speech is, I think, immune from prosecution. Certainly there is no constitutional line between advocacy of abstract ideas as in *Yates* and advocacy of political action as in *Scales*. The quality of advocacy turns on the depth of the conviction; and government has no power to invade that sanctuary of belief and conscience.[3]

---

[3] See MR. JUSTICE BLACK, dissenting, in *Communications Assn.* v. *Douds,* 339 U. S. 382, 446, 449 *et seq.*