OPINION OF THE COURT
John S. Conable, J.
An order to show cause having been issued pursuant to my direction on the 23rd day of October, 1980, returnable before me at a term of this court held at the Attica Correctional Facility, Wyoming County, Attica, New York, on the 19th day of November, 1980, and a return sworn to on the 18th day of November, 1981 having been filed by the respondents herein, and the matter having come on to be heard before me, and due deliberation having been had, the following decision is rendered.
The petitioner is an inmate at the Attica Correctional Facility. He commenced this CPLR article 78 proceeding to *725 challenge a blanket ban on a publication known as Arm the Spirit. It appears that he learned of this ban through a radio announcement, on October 15, 1980 which notified inmates that Central Office Media Review had directed that no issues of Arm the Spirit be allowed in any correction facilities. The petitioner feels that this ban should be declared void as a violation of the First Amendment to the United States Constitution.
The respondents have relied upon certain directives of the Department of Correctional Services to justify compliance with the decision of Central Office Media Review. It is their contention that Arm the Spirit “is not a Bonafide newspaper” but is actually “a compilation of articles, and letters written by inmates of various correctional facilities”. Therefore, it is asserted that this publication frustrates the facility policy against allowing correspondence between inmates incarcerated in separate facilities and violates Directive No. 4521 which forbids the mailing of “inmate publications” to other facilities or private citizens without the superintendent’s approval. Furthermore, the respondents feel that the contents of the paper violate standards set forth in Directive No. 4572. According to this argument, inmates should be denied access to this material on the following grounds:
1. It “advocates, with intent to accomplish, and presents a clear and immediate risk of the violent overthrow of the existing form of government”.
2. It “advocates and presents a clear and immediate risk of lawlessness, violence, anarchy, or rebellion against governmental authority”.
3. It invites “disobedience towards law enforcement officers or prison personnel”, and
4. It “presents a clear and immediate risk to the safety of any person or a clear and immediate risk to the order of the correctional facility” (see Directive No. 4572, p 2, § B, subds [4], [5], [6], [9]).
The Assistant Attorney-General has cited the Federal District Court case Jackson v Ward (458 F Supp 546) to support the contention that these standards are constitutional.
*726 The parties have submitted two copies of the publication for this court’s review. Issue No. 6, dated February-April, 1980, consists of 32 pages and proclaims itself to be “A Revolutionary Prisoners Newsletter”. Issue No. 9 is dated October-November, 1980, consists of 20 pages and is labeled as “A Revolutionary Prisoners Newspaper”. Both issues are a product of the Haight-Ashbury Arts Workshop of Berkeley, California. The respondents have offered no other factual proof as to what particular inmates under their jurisdiction are using this publication for purposes of communication or what such messages consist of, nor have they alleged what actions are immediately threatened by the introduction of this paper into a correctional facility. It has been left to the court to determine which of the articles violate the above-cited standards as set forth in the applicable directives.
Before evaluating the proof, it is necessary to review the scope of First Amendment protection in the prison setting. Morgan v La Vallee (526 F2d 221), appears to be the appellate court case which is closest in point in this jurisdiction. In that case, the United States Court of Appeals for the Second Circuit reviewed the trial court’s dismissal of a State prisoner’s civil rights claim that prison authorities had violated his constitutional rights by not letting him receive a specific publication. The court held that the complaint in question sufficiently alleged a violation of the inmate’s “right to access to media” and stated (p 224): “First Amendment rights to hold and express beliefs and receive information are entitled to ‘special solicitude’ * * * Thus affirmative justification for withholding a given publication must be furnished”.
The Circuit Court remanded the case so that the District Court could determine if the publication in question could be excluded under the tests set forth by the United States Supreme Court in United States v O'Brien (391 US 367, 377) and Procunier v Martinez (416 US 396). This court has already adopted this view of the Circuit Court that these Supreme Court cases must be applied to determine if a publication may be excluded from a prison. (See Matter of Clark v Smith, Supreme Ct, Wyoming County, April 23, 1981, Index No. 8625.)
*727 The First Amendment test referred to in Morgan (supra) was expressed as follows by the United States Supreme Court in United States v O’Brien (supra, p 377): “we think it clear that a government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.”
In Procunier v Martinez (supra) the Supreme Court referred to the test in establishing a standard of review for censorship of prison mail. The court held that such censorship must satisfy two criteria. First, it must further a substantial governmental interest “unrelated to the suppression of expression” (p 413). Prison officials cannot merely “eliminate unflattering or unwelcome opinions or factually inaccurate statements” (p 413). Instead, they must show that the censorship promotes an interest in security, order or rehabilitation. Second, such restrictions on First Amendment freedoms must not be overly broad, they must be “no greater than is necessary or essential to the protection of the particular governmental interest involved” (p 413).
In the instant case, the respondents face a heavy burden of proving that the publication may be excluded. First of all, they are attempting to totally exclude the publication solely on the basis of the content of some of its issues. No allegation has been made that any inmate has engaged in any conduct susceptible to legitimate control. It has not even been contended that a specific inmate in Attica has used the paper as a “newsletter”. Furthermore, the United States Supreme Court has held that the scope of First Amendment protection “embraces the right to distribute literature * * * and necessarily protects the right to receive it”. (Martin v Struthers, 319 US 141, 143.) In Procunier (supra, p 412) the Supreme Court partially based its application of the First Amendment to prison correspondence upon the view that both the addressee and the writer enjoyed such constitutional protections in such correspon *728 dence. As a result, in analyzing the validity of the censorship imposed here, some consideration must be given to the impact it has on private citizens who seek to express their political views in Arm the Spirit.
Applying these standards to the instant case, this court does not believe that the respondents may properly ban Arm the Spirit by characterizing it as an inmate newsletter pursuant to Directive No. 4521. The restrictions of this directive must be directed to activities within a given facility. If an institution allows inmates to use facilities in order to publish a newsletter or a newspaper, there is no reason why reasonable restraints may not be utilized to prevent abuse of such privileges. In allowing such activities to take place, authorities may take steps to prevent the participants from using the paper as a platform for ridiculing the administration or as a vehicle for organizing dissident inmates. However, the restraints of this directive may not be applied to a publication run by private citizens just because an inmate may write a letter to the paper. Such an interpretation would make the regulation overly broad in scope and would unnecessarily restrict the right of outsiders to convey political views to inmates. All newspapers have editorial pages which publish the views of private citizens and columns which respond to the complaints and opinions of the public. If an inmate wrote a letter to such a paper, it would be published without subjecting the paper to a restriction upon its First Amendment rights. It would be unjustified to impose a greater restriction upon Arm the Spirit just because its publishers have chosen to devote its coverage to a limited range of topics.
Nor can the paper be banned on the grounds that it helps inmates evade the rule that they cannot communicate with inmates in other facilities. No proof has been submitted that the paper has actually been used in such a manner. It is not apparent that the paper offers any space for the exchanges of such personal information. To the contrary, it appears that the articles submitted from inmates tend to relate to prison conditions of interest to inmates in general or merely praise the staff of Arm the Spirit for its noble work. The respondents have failed to show that personal communications which pose a threat to security cannot be *729 controlled by means of a less severe restriction upon the First Amendment rights of inmates and of outside parties.
The respondents’ remaining objections to Arm the Spirit relate to their fear that it would invite inmates to take certain undesirable actions. This stance constitutes a direct restraint upon expression based solely upon its content. Such a restraint must be closely scrutinized to determine if it is aimed at the mere advocacy of ideas and not limited to proscribing the incitement of imminent wrongful conduct. One of the leading Supreme Court cases which outlines, the approach to solving this problem is Brandenburg v Ohio (395 US 444). In that case, the court struck down a criminal syndicalism statute and held that (pp 447-448): “the constitiutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action. As we said in Noto v. United States, 367 U.S. 290, 297-298 (1961), The mere abstract teaching * * * of the moral propriety or even moral necessity for a resort to force and violence, is not the same as preparing a group for violent action and steeling it to such action.’ ”
This court has previously held that this test must be applied to the administration’s attempts to ban publication which are alleged to incite wrongful acts, including the incitement of inmates to disobedience. (See Matter of Clark v Smith, supra.) The respondents have cited Chief Judge Curtin’s decision in Jackson v Ward (458 F Supp 546, supra), to support their contention that the regulation directed at the incitement of disobedience is valid as written. Although this regulation does not incorporate the test that the objectionable language pose an imminent danger as is set forth in other parts of the directive, Chief Judge Curtin found this to be a valid rule. However, it should be noted that the Judge emphasized that “There must be a substantial showing by the media review committee members that the publication does indeed pose a tangible threat to the order and security of the institution for such publication to be banned under this guideline.” (458 F Supp, at p 563.) This court does not feel that such a showing has been *730 made here and further feels that the District Court decision does not forbid a holding that the Brandenburg test does apply to this attempted restriction.
This court does not believe that the respondents have met their burden of proving that this, direct and total suppression of expression is no greater than necessary to protect security on the ground that Arm the Spirit is likely to produce some imminent wrongful conduct on the part of inmates who read its contents. The most troublesome articles in the paper are those which deal with inmates who are currently subjected to legal prosecution for past rebellions against prison personnel. Despite the fact that some of these rebellions resulted in the deaths of correction officers, the paper adopts the view that the current prosecutions are unjustified because the inmates were driven to their revolt by brutal prison conditions. However, even though this court condemns their view as a matter of principle, it cannot thereby uphold exclusion of all the paper’s issues. Such legal proceedings are clearly newsworthy events which are probably subjected to coverage by other branches of the media. Defense attorneys might conceivably raise similar issues in defense of the prosecutions. It cannot be said on this record that this - press coverage would create an imminent danger that similar events will occur at Attica. Indeed this court questions whether or not it could be proven that such a danger is created by the printed word, absent proof of a very specific appeal for a precise course of action.
Therefore, it is the determination of this court that the ban currently imposed by the respondents is illegal as a violation of the First Amendment.
The respondents are hereby ordered to cease enforcement of this ban at the Attica facility.