OPINION OF THE COURT
Laura Safer-Espinoza, J.
Defendants have moved to dismiss the charges of unlawful *873 assembly filed against each of them under Penal Law § 240.10, stemming from incidents alleged to have occurred on May 1, 1990 in Tompkins Square Park.
Defendants contend that the unlawful assembly statute is facially unconstitutional, as vague and overbroad. The fundamental concern expressed by these defendants, i.e., that individuals about to exercise their rights of speech and assembly remain in doubt regarding the permissible scope of their behavior under Penal Law § 240.10, serves to underline the overlap in the vagueness and overbreadth doctrines.
Specifically defendants argue that under a literal reading, the statute does not require any overt manifestation of a purpose to engage in violent and tumultuous conduct. Since intervention is permitted before such a manifestation, what constitutes the purpose to engage in violent and tumultuous conduct or to prepare for such conduct, is left to the subjective determination of law enforcement officials.
They contend that the portion of the statute concerning when an assembly has "developed” an unlawful purpose is particularly vulnerable to this criticism. If some portion of those assembled do develop an unlawful purpose, how is that to be determined, and what are the obligations of those individuals exercising their rights to peaceable assembly in order to escape being perceived as having the intent to advance that purpose?
Defendants argue that since no requirement of a "clear and present danger” or "imminent unlawful action” is embodied in the statute, its enforcement may result in violation of their constitutionally protected rights of speech and assembly, when they engage in activities such as rousing speeches, chanting slogans, burning effigies, or simply remaining in silence when it has somehow been determined that the assembly has developed an unlawful purpose.
As the People point out, New York’s original unlawful assembly statute was enacted in 1909. The statute was revised in 1965, when two unlawful assembly offenses defined in the former Penal Law were replaced by Penal Law § 240.10. The statute is geared to riot in the second degree (Penal Law § 240.05) and is, in effect, an anticipatory offense with respect to that charge.
Further insight into the unlawful assembly statute is provided by the Practice Commentaries to Penal Law § 240.08— inciting to riot (Donnino, Practice Commentaries, McKinney’s *874 -Cons Laws of NY, Book 39, Penal Law § 240.08, at 213): "The crime of 'inciting to riot’, newly defined in the 1965 revision, 'covers conduct in the riot area which does not amount to either the crime of "riot” or the crime of "unlawful assembly.” A rabble rouser who urges a group of twenty people to go out and break windows in a [minority] neighborhood and acquires the acquiescence of at least four of them is guilty of unlawful assembly, even if the project does not materialize * * *. In the absence of such approval or cooperation, however, he is not guilty of unlawful assembly, for he has not assembled with four or more other persons for the pre-conceived or agreed purpose of engaging in riotous conduct [§ 240.10]. The instant section fills the indicated gap with the crime of "inciting to riot.” ’ (Denzer and McQuillan, Practice Commentary to 240.08, McKinney’s Penal Law (1967)” (emphasis added).
New York’s unlawful assembly statute has generated very little reported case law. Whatever cases do exist are far too dated to provide significant guidance (People v Most, 128 NY 108 [1891]; Slater v Wood, 9 Bosw 15 [1861]; Michaels v Hillman, 111 Misc 284 [1920]; People v Westfall, 6 AD2d 732 [1958]; People ex rel. Mertig v Johnston, 186 Misc 1041 [1946]). The two most "recent” cases dismissed the charges against the defendants, without discussing the issue of constitutionality (People v Garfield, 63 Misc 2d 79 [1970]; People v Martinez, 43 Misc 2d 94 [1964]).
The court notes that in each of the three situations that may constitute the crime under Penal Law § 240.10 — (1) assembling with four or more persons for the purpose of engaging with them in tumultuous and violent conduct likely to cause public alarm; (2) assembling with four or more persons for the purpose of preparing to engage with them in such conduct; and (3) remaining at an assembly which has developed one of the above purposes with the intent to advance such purpose — the overt act required by the statute is that of assembly.
While it is clear that Penal Law § 240.10 is far from unique in its reliance upon a defendant’s purpose or intent to transform an otherwise innocent act into a criminal one (e.g., burglary, possession of a weapon with intent to use unlawfully); is it also true that the "act” required by this particular statute is one to which our Federal and State Constitutions extend protection as a fundamental right (US Const 1st Amend; NY Const, art I, § 9).
*875 It is beyond question that subsequent to the enactment of New York’s original unlawful assembly statutes, the law concerning First Amendment questions evolved dramatically.
In those years, the "clear and present danger” test developed as the standard to determine when otherwise protected speech and advocacy could be found unlawful. It is also fair to say that a strengthening of that test so that it became a tool for the protection instead of the suppression of First Amendment activity moved from a dissenting to a majority position. Under the "clear and present danger” standard, the courts scrutinized the facts of particular cases to see whether a danger of bringing about the "substantive evils” that Congress had a right to prevent, justified suppression of the expression at issue (Gitlow v New York, 268 US 652 [1925]; Abrams v United States, 250 US 616 [1919]; Dennis v United States, 341 US 494 [1951]; Yates v United States, 354 US 298 [1957]; Edwards v South Carolina, 372 US 229 [1963]; Terminiello v Chicago, 337 US 1 [1949]).
Neither the 1965 revision nor a 1967 amendment to Penal Law § 240.10 was motivated by constitutional concerns (see, former Penal Law §§ 2092, 2094). Following those revisions, however, in Brandenburg v Ohio (395 US 444 [1969]), the United States Supreme Court articulated its clearest and most protective standard concerning statutes which affected freedom of speech and assembly.
Noting that its previous decisions upholding criminal syndicalism legislation on the grounds that, without more, advocating violent means to effect political and economic change involves such danger to the security of the State that it may be outlawed, had been thoroughly discredited by later decisions, and focusing both on the nature of the restricted conduct and its likely results, the court stated that: "These later decisions have fashioned the principle that the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action” (Brandenburg v Ohio, supra, at 447; emphasis added).
Finding that the Ohio Criminal Syndicalism Act purported to punish assembly with others to advocate the duty, necessity or propriety of violence as a means of accomplishing industrial or political reform, that statute was ruled unconstitu *876 tional. In doing so, the court combined two standards of analysis which had previously been seen as competing: (1) a focus on the words or conduct to determine whether they constituted solely an incitement to law violation, and (2) the likelihood that lawless action would actually result.
The court also took pains to point out that "[statutes affecting the right of assembly * * * must observe the established distinctions between mere advocacy and incitement to imminent lawless action”, emphasizing that " '[t]he right of peaceable assembly is a right cognate to those of free speech and free press and is equally fundamental’ ” (Brandenburg v Ohio, 395 US, supra, at 449, n 4, citing De Jonge v Oregon, 299 US 353, 364).
In examining New York’s unlawful assembly statute, this court can certainly imagine a series of disturbing examples of unconstitutional applications of it, several of which are set forth by counsel in their memoranda of law. Indeed, we need look no farther than the above-cited Practice Commentaries, which provide the example of a group which has agreed to do an evil act — that of breaking windows in the Black community — without any requirement- whatsoever that the action agreed upon be imminent, or that the group even possess the means and ability to fulfill its purpose. The idea that it is up to law enforcement authorities to determine who has remained at an assembly which has recently developed an unlawful purpose, with an intent to advance that purpose, is particularly disturbing. In practice, it may tend to impose an affirmative obligation upon those who are engaging in a legitimate exercise of First Amendment rights to leave an area where some other undefined percentage of those gathered are promoting or engaging in violence.
It is clearly established principle of constitutional law, however, that the mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge. On the contrary, the requirement is that the overbreadth of a statute, "particularly where conduct and not merely speech is involved * * * must not only be real, but substantial as well” (Broadrick v Oklahoma, 413 US 601, 615 [1973]).
While the concept of "substantial overbreadth” is not readily reduced to an exact definition, it is clear that there must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of par *877 ties not before the court to justify prohibiting a State from enforcing the statute against conduct that is admittedly within its power to proscribe (City Council v Taxpayers for Vincent, 466 US 789 [1984]).
Despite some possibly impermissible application, the substantial overbreadth requirement has been invoked to avoid striking down a statute where there is a core of easily identifiable and constitutionally proscribable conduct that the statute prohibits (Secretary of State of Md. v Munson Co., 467 US 947 [1984]; CSC v Letter Carriers, 413 US 548 [1973]; Parker v Levy, 417 US 733, 760 [1974]).
In the opinion of this court, the residents of New York need only look as far as some of our neighborhoods in the recent past, where the incitement of racial hatred caused crowds to gather and to arm themselves in a manner that was directed at, likely to produce, and did in fact produce "lawless action” with such tragic consequences, for a whole range of easily identifiable and constitutionally proscribable conduct prohibited by the unlawful assembly statute.
The constitutional provision that Congress shall make no law abridging "the right of the people peaceably to assemble, and to petition the Government for a redress of grievances” (US Const 1st Amend) although applicable to the States, does not deprive the people of their right to legislate against mob action and riots. This court assumes that there would be very little argument with the proposition that members of a mob bent on a lynching, if forcibly dispersed by peace officers, are in no position to complain that they have been deprived of the rights of peaceable assembly and freedom of speech. Nor can the importance of allowing law enforcement officers to “nip” such violent and repugnant actions "in the bud” be denied.
Defendants do contend, however, that New York’s unlawful assembly statute as it now reads, does not sufficiently define when such a "bud” is present, in accordance with constitutional principles.
Perhaps the most elementary maxim of constitutional decision making is that "[n]o statute should be declared unconstitutional if by any reasonable construction it can be given a meaning in harmony with the fundamental law” (People ex rel. Simpson v Wells, 181 NY 252, 257; People v Liberta, 64 NY2d 152, cert denied 471 US 1020; People v Epton, 19 NY2d 496 [1967]).
Unless the statute provides expressly or by necessary impli *878 cation that the constitutional requirements are absent, we may reasonably find such requirements implicit in the statute (People ex rel. Morriale v Branham, 291 NY 312 [1943]).
In cases bearing directly upon the area of freedom of speech, despite definitive precedent from its prior decisions to the contrary, the New York Court of Appeals read into the criminal anarchy statutes (see, Penal Law § 240.15, outlawing the advocacy of the overthrow of the existing form of government by violence, as well as membership in any organization or distribution of any literature advocating such overthrow) a requirement that the defendant’s words and actions create a "clear and present danger”, thus reinterpreting the statutes to accommodate more recent First Amendment developments (People v Gitlow, 234 NY 132, affd Gitlow v New York, 268 US 652, supra; People v Epton, supra, at 505-506; Matter of Bell v Waterfront Commn., 20 NY2d 54 [1967]).
Although Bell (supra) was decided prior to Brandenburg (395 US 444, supra), its language closely traces the standards set forth in that landmark case, and is an undeniable example of the reasoning of the highest court of this State, when measuring statutes by those standards: "Accordingly, as required by the First Amendment, we read the Waterfront Commission Act and construe the clause, 'knowingly or willingly advocates the desirability of overthrowing the government of the United States by force or violence,’ to proscribe only that type of advocacy (1) which is intended to indoctrinate or incite to action in furtherance of the defined doctrine and (2) which is accompanied by a ‘clear and present danger’ of success” (Matter of Bell v Waterfront Commn., supra, at 62).
This court agrees that the problems with New York’s unlawful assembly statute and its attendant potential to chill First Amendment activity can only be cured by superimposing the requirements of Brandenburg (supra) upon its provisions.
It is also correct that a legislative revision to this effect would be more effective than the addition of these requirements in the form of a "judicial gloss”. In fact, the approach followed by the Virginia Legislature, following the voiding of its unlawful assembly statute in Owens v Commonwealth (211 Va 633, 179 SE2d 477) was ideal in its remedy of constitutional defects. The statute enacted following Owens, and whose constitutionality has subsequently been upheld, reads: "Whenever three or more persons assembled share the common intent to advance some lawful or unlawful purpose by *879 the commission of an act or acts of unlawful force or violence likely to jeopardize seriously public safety, peace or order, and the assembly actually tends to inspire persons of ordinary courage with well-grounded fear of serious and immediate breaches of public safety, peace or order, then such assembly is an unlawful assembly” (emphasis added).
At the same time, this court recognizes that such legislative revision is unlikely, particularly since the criminal anarchy statute — a prototype of the law ruled unconstitutional in Brandenburg (supra) — remains in the New York Penal Law. As previously pointed out, this statute was upheld by the Court of Appeals by reading the "clear and present danger” test into it. (People v Epton, 19 NY2d 496, supra.) It is likely that the same statute would survive a post-Brandenburg challenge through a similar approach.
In a 1970 case dealing with a challenge to the constitutionality of New York’s incitement to riot statute, it was held that "[t]he fact that the statute makes no reference to 'intent’ or to a 'clear and present danger’ does not doom it as unconstitutional. While mindful of the necessity of these two elements before one’s freedom of speech may be abridged,” the court ruled it sufficient that the statute be interpreted "as requiring these elements in accordance with sound constitutional principles so as to preserve its constitutionality” (People v Winston, 64 Misc 2d 150, 156 [1970]).
It is also worth noting that the United States Supreme Court in Brandenburg (supra) specifically stated that no construction of the statute in question by the Ohio courts had brought it within constitutionally permissible limits, thereby implying that had such a construction existed, the court might not have been constrained to void the statute.
In the opinion of this court, both the doctrines of substantial overbreadth and the well-established practice of upholding statutes such as the one before this court by reading constitutional requirements into them, dictate the decision regarding the constitutionality of New York’s unlawful assembly statute.
Therefore, pursuant to the foregoing opinion, this court finds that sound constitutional requirements must be read into Penal Law § 240.10 to preserve its constitutionality. Specifically, the statute must be read to incorporate the tests set forth in Brandenburg (395 US 444, supra) — that is, that before an individual may be charged with unlawful assembly, his actions must constitute an incitement which is both di *880 rected towards and likely to produce imminent violent and tumultuous conduct. As so interpreted, this court finds the statute constitutional.
As a caveat to this holding, it is appropriate to comment briefly upon the standard to be used in cases that may arise under this statute.
When the group activity out of which the alleged offense develops can be described as involving both legal and illegal purposes and conduct, and is within the shadow of the First Amendment, the factual issue as to the alleged criminal intent must be strictly judged. It has been held that specially meticulous inquiry into the sufficiency of proof is justified and required because of the real possibility in considering group activity, characteristic of political or social movements, of an unfair imputation of the intent or acts of some participants to all others (United States v Dellinger, 472 F2d 340 [1972]; United States v Spock, 416 F2d 165 [1969]).
Therefore, it is clear that in cases of this nature arising under New York’s unlawful assembly statute, juries should be instructed regarding the First Amendment tests set forth in Brandenburg (supra), as well as the standard of strict scrutiny to be applied in their evaluation of the facts.
[The court then analyzed whether the factual allegations contained in the complaints were legally sufficient. This discussion has been omitted for purposes of publication.]
[Portions of opinion omitted for purposes of publication.]