OPINION OF THE COURT
Elisa S. Koenderman, J.
The defendants, Jose Sanchez, Julian Cuevas, Eduardo Hernandez and Jesus Quiles, are charged, acting in concert, with unlawful assembly (Penal Law § 240.10) and violating New York City Parks and Recreation Department Rules (56 RCNY) § 1-05 (a) (1), entitled “Assemblies, meetings, exhibitions.” In separate omnibus motions, the defendants move to dismiss the accusatory instrument against them on the ground of facial insufficiency. Because the factual allegations of the information, when . given a “fair and not overly restrictive reading” and accepted as true, provide the defendants with sufficient notice to prepare a defense and are adequately detailed to prevent them from being tried twice for the same offense, the defendants’ motions are denied (see People v Casey, 95 NY2d 354, 360 [2000]; People v Kalin, 12 NY3d 225, 231 [2009]).
Facial Sufficiency
In order to be facially sufficient, an information must substantially conform to the formal requirements of Criminal Procedure Law § 100.15. Additionally, the factual portion and any accompanying depositions must provide reasonable cause to believe the defendant committed the offense charged, as well as nonhearsay factual allegations of an evidentiary character which, if true, establish every element of the offense charged and defendant’s commission thereof (CPL 100.15 [3]; 100.40 [1]; see People v Dumas, 68 NY2d 729 [1986]; see also People v *1106 Alejandro, 70 NY2d 133 [1987]). The complete failure to plead an element of a crime is a nonwaivable jurisdictional defect (see Casey, 95 NY2d at 356; Alejandro, 70 NY2d at 137-138).
While the requirement of nonhearsay allegations has been described as a “much more demanding standard” than a showing of reasonable cause alone (Alejandro, 70 NY2d at 138, quoting 1968 Report of Temp Commn on Rev of Penal Law and Crim Code, Introductory Comments, at xviii), it is nevertheless a much lower threshold than the burden of proof beyond a reasonable doubt (People v Henderson, 92 NY2d 677, 680 [1999]; People v Hyde, 302 AD2d 101 [1st Dept 2003]). Where the factual allegations contained in an information “give an accused notice sufficient to prepare a defense and are adequately detailed to prevent a defendant from being tried twice for the same offense, they should be given a fair and not overly restrictive or technical reading” (Casey, 95 NY2d at 360; see also People v Konieczny, 2 NY3d 569 [2004]; People v Jacoby, 304 NY 33, 38-40 [1952]; People v Knapp, 152 Misc 368, 370 [1934], affd 242 App Div 811 [1934]; People v Allen, 92 NY2d 378, 385 [1998]; People v Miles, 64 NY2d 731, 732-733 [1984]; People v Shea, 68 Misc 2d 271, 272 [1971]; People v Scott, 8 Misc 3d 428, 429 [2005]). Thus, “[t]he law does not require that the information contain the most precise words or phrases most clearly expressing the charge, only that the crime and the factual basis therefor be sufficiently alleged” (People v Sylla, 7 Misc 3d 8, 10 [App Term, 2d Dept 2005]). The ultimate question is whether “the alleged facts and the reasonable inferences to be drawn from those facts, viewed in the light most favorable to the People, would, if true, establish every element of the crime charged” (People v Barona, 19 Misc 3d 1122[A], 2008 NY Slip Op 50814[U], *2 [Crim Ct, NY County 2008]).
The instant information alleges that on March 14, 2009, at about 6:22 p.m. at the intersection of North Conduit Avenue and 115th Street in Queens County, Detective Rafael Ramos of the Queens Gang Unit observed the defendants along with 22 other apprehended individuals at Southern Field Park. None of the defendants or the other 22 individuals produced a valid special events permit. The defendants and the 22 others were all wearing a combination of black and yellow, which Detective Ramos stated are the “colors” of the Latin Kings gang. Further, Detective Ramos observed the defendants and the 22 others exchange “hand signs and distinctive hand shakes.” Detective Ramos concluded, based upon his experience investigating numerous *1107 violent gang crimes while assigned to the Gang Unit for more than 11 years, and based upon his training at multiple conferences and courses on gang activity, that the defendants were engaged in a “ ‘universal meeting’ at which future gang activities are planned and discussed including violent criminal activity.”
Under Penal Law § 240.10,
“[a] person is guilty of unlawful assembly when he assembles with four or more other persons for the purpose of engaging or preparing to engage with them in tumultuous and violent conduct likely to cause public alarm, or when, being present at any assembly which either has or develops such purpose, he remains there with intent to advance that purpose.”
Under 56 RCNY 1-05 (a) (1), “[n]o person shall hold or sponsor any special event or demonstration [in a park] without a permit.” A “special event” is defined as “a group activity including, but not limited to, a performance, meeting, assembly, contest, exhibit, ceremony, parade, athletic competition, reading, or picnic involving more than 20 people.” (56 RCNY 1-02.)
The defendants argue that the factual allegations of the information “amount to a group of kids hanging out in a park exchanging hand gestures” and do not establish that the defendants’ actions were likely to produce imminent violent and tumultuous conduct. Further, they claim that the deponent officer’s assertions that the defendants’ actions demonstrated that they were engaged in a “universal meeting” of the Latin Kings gang is conclusory and speculative. Accordingly, they contend that the information against them must be dismissed as jurisdictionally defective.
There are two issues that must be resolved in order to decide the defendants’ motion. First, what elements must the offense of unlawful assembly require in order not to infringe upon the rights to free speech and free assembly under the First Amendment? Next, does the defendants’ alleged conduct satisfy the requisite elements of the offense of unlawful assembly and the charged violation of the Parks and Recreation Department Rules?
The offense of unlawful assembly was initially codified in 1881. Under Penal Code of 1881 § 451 (3),
“[w]henever any three or more persons, . . .
“being assembled, attempt or threaten any act tend *1108 ing towards a breach of the peace, or injury to person or property, or any unlawful act, such an assembly is unlawful, and every person participating therein by his presence, aid, or instigation is guilty ■ of a misdemeanor” (see People v Most, 128 NY 108 [1891]).
Unlawful assembly “was an offense well known at common law” and was defined as a “ ‘disturbance of the peace by persons assembling together with intention to do a thing which, if executed, would make them rioters, but neither executing it nor making a motion towards its execution’ ” (128 NY at 113, 116). The main purpose of unlawful assembly at common law and as subsequently codified “is the protection of the public peace” (id. at 115). The current unlawful assembly statute, enacted in 1965, was drafted as an inchoate crime to riot in the second degree and was designed to penalize a person who joins with four or more others to engage in a riot, even if the riot does not occur (see Donnino, Practice Commentaries, McKinney’s Cons Laws of NY, Book 39, Penal Law § 240.10 [2008]; see also People v Biltsted, 150 Misc 2d 872, 873 [Crim Ct, NY County 1991]).
The offense of unlawful assembly does not expressly require as an element that the offender’s actions constitute an incitement which is directed towards and likely to produce imminent violent and tumultuous conduct. This requirement was superimposed upon the statute by the court in Biltsted (supra), upon a finding that the statute was unconstitutionally overbroad pursuant to Brandenburg v Ohio (395 US 444 [1969]).
In Brandenburg (at 444-445), the United States Supreme Court struck down an Ohio criminal syndicalism statute which penalized “advocating] . . . the duty, necessity, or propriety of crime, sabotage, violence, or unlawful methods of terrorism as a means of accomplishing industrial or political reform” and “voluntarily assembling] with any society, group, or assemblage of persons formed to teach or advocate the doctrines of criminal syndicalism.” The appellant, a leader of the Ku Klux Klan, was convicted under the Ohio criminal syndicalism statute for participating at an organizer’s meeting where he expressed derogatory views regarding African-Americans and Jews and alluded to the possibility of “revengeance” being taken by the allegedly suppressed “white, Caucasian race” (id. at 446). In reversing the appellant’s conviction and declaring the statute unconstitutional, the Court ruled that the constitutional guarantees of free speech and free press do not permit a state to forbid or proscribe advocacy of the use of force or violence except
*1109 where such advocacy is directed to and is likely to incite or produce imminent lawless action {id. at 447). The Court further noted that the right of peaceable assembly is cognate to the rights of free speech and free press and is equally fundamental {id. at 449 n 4, citing De Jonge v Oregon, 299 US 353, 364 [1937]). Thus, statutes which affect the right of free assembly must also “observe the established distinctions between mere advocacy and incitement to imminent lawless action” (id.). The Ohio criminal syndicalism statute, which punished both advocacy of the use of force or violence to accomplish political or industrial reform and assembly with others to advocate or teach such doctrines, failed to observe these distinctions and therefore was unconstitutional (id.). The Court reasoned that “the mere abstract teaching ... of the moral propriety or even moral necessity for a resort to force and violence, is not the same as preparing a group for violent action and steeling it to such action” (id. at 448, quoting Noto v United States, 367 US 290, 297-298 [1961]).
In Noto (supra), the petitioner, an affiliate of the Communist Party, was convicted under the membership clause of the Smith Act for belonging to an organization which sought the violent overthrow of the government. The U.S. Supreme Court ruled that although the evidence demonstrated that the Communist Party propagated the forcible overthrow of the government, it failed to establish that the Communist Party presently urged the “violent overthrow of the Government now or in the future” (id. at 298). The Court noted the distinction between the statement of “an idea which may prompt its hearers to take unlawful action” and exhortation that such action be taken (id. at 297, quoting Yates v United States, 354 US 298, 322 [1957]). To sustain a conviction, the Court ruled that “[t]here must be some substantial direct or circumstantial evidence of a call to violence now or in the future which is both sufficiently strong and sufficiently pervasive to lend color to the otherwise theoretical material regarding Communist Party teaching” (367 US at 298). Finding that the evidence presented was “too remote from concrete action” to be regarded as “indoctrination of a group in preparation for future violent action,” the Court reversed the conviction on the ground of legal insufficiency (id. at 297, citing Dennis v United States, 341 US 494 [1951]).
In Dennis (supra), the U.S. Supreme Court upheld the convictions of the petitioners for violating the conspiracy provisions of the Smith Act by organizing a group to plot the violent over *1110 throw of the government. The Court found that the evidence established that the petitioners were leaders of a “highly organized conspiracy, with rigidly disciplined members” ready to make the attempt to overthrow the government by force and violence (341 US at 511). Concluding that the petitioner’s actions created a “clear and present danger” of the evil the statute was aimed to prevent, the Court held that the Smith Act, as applied to the petitioners, did not violate their First Amendment rights (id. at 511). The Court ruled that even though no attempted overthrow had yet occurred,
“the words [clear and present danger] cannot mean that before the Government may act, it must wait until the putsch is about to be executed, the plans have been laid and the signal is awaited ....
“If the ingredients of the reaction are present, we cannot bind the Government to wait until the catalyst is added” (id. at 509, 511).
Unlike the Ohio criminal syndicalism statute declared unconstitutional in Brandenburg, New York’s unlawful assembly statute does not purport to penalize assembly with others “merely to advocate” the use of force or violence (see Brandenburg, 395 US at 449). Rather, it punishes assembly with others “for the purpose of engaging or preparing to engage . . . in tumultuous and violent conduct likely to cause public alarm” (Penal Law § 240.10). Preparing to commit an unlawful act is different from merely advocating that an unlawful act be committed. Advocacy that an unlawful act be committed may not be circumscribed unless it is directed to and likely to incite or produce imminent lawless action (see 395 US at 447). Otherwise, such advocacy is too remote from action to be punishable (see Noto, 367 US at 297). In contrast, where there is preparation to commit an unlawful act, the danger that an unlawful act will occur is implicit in the preparation to commit it. As distinguished from mere advocacy, preparation is not remote from action and is in fact a precedent to taking action. Thus, to contend that a conspiracy to act “cannot be constitutionally restrained, because it comprises only the preparation” is erroneous, since “[i]t is the existence of the conspiracy which creates the danger” (Dennis, 341 US at 511). As opposed to assembly for the purpose of merely advocating the use of force or violence, assembly for the purpose of engaging or preparing to engage in violent and tumultuous conduct is in effect assembly to “prepar[e] a group for violent action and steel[ ] it to such action” (Brandenburg, *1111 395 US at 448). While the former may be protected by constitutional guarantee, the latter is not (see id.; Noto, 367 US at 297; Dennis, 341 US at 510-511). By punishing assembly with others for this defined and specific purpose, New York’s unlawful assembly statute observes “the established distinctions between mere advocacy and incitement to imminent lawless action” (395 US at 449 n 4). Indeed, because “clear and present danger” is inherent in assembly with others to prepare to engage in violent and tumultuous conduct likely to cause public alarm (see Dennis, 341 US at 511), the “incitement to imminent lawless action” required for mere advocacy is inapplicable. Since the “danger” lies in the preparation to engage in violent and tumultuous conduct, neither “incitement” nor “imminence” are necessary. For example, there can be no doubt that the First Amendment would not have protected a meeting of A1 Qaeda to plan the attack on the World Trade Center even if that attack were not to occur until months later. Because New York’s unlawful assembly statute punishes assembly to prepare to commit an unlawful act rather than assembly to merely advocate that an unlawful act be committed, the statute is constitutional on its face and no requirement that the defendant’s actions constitute an incitement to imminent lawless action need be superimposed upon it (contra Biltsted, 150 Misc 2d at 879-880).[1]
Having determined that, as drafted, the offense of unlawful assembly does not impermissibly infringe upon the rights to free speech and free assembly under the First Amendment, the issue remains whether the defendants’ conduct as alleged in the information establishes each and every element of that crime and the charged New York City Parks and Recreation Department Rules violation. With respect to unlawful assembly, the crucial inquiry is whether the facts alleged are sufficient to demonstrate that the defendants assembled for the purpose of preparing to engage in violent and tumultuous conduct likely to cause public alarm. When viewed in the light most favorable to *1112 the People, the factual allegations of the information and the fair inferences to be drawn from them indeed provide reasonable cause to believe that the defendants committed the charged crimes (see Barona, 19 Misc 3d 1122[A], 2008 NY Slip Op 50814[U], *1 [2008]). The deponent officer, a detective with 11 years of experience investigating violent gang crimes while assigned to the Queens Gang Unit, observed the defendants and 22 other individuals together in Southern Field Park, without a special events permit, all wearing the yellow and black colors of the Latin Kangs gang and exchanging distinctive hand signs and handshakes. Based upon his investigatory experience and his training at multiple conferences and courses on gang activity, he concluded that this assembly was a “universal meeting” at which future gang activities, including violent criminal activity, are planned. Significantly, the defendants are not alleged to be members of a political group or association meeting to advocate the use of force or violence to achieve reform; rather, they are alleged to be members of a notorious street gang with a history of committing violent crimes.[2] Contrary to the defendants’ contention, the officer’s conclusion that the defendants were engaged in a “universal meeting” of the Latin Kings gang at which future violent criminal activity is planned is not speculative but rather is founded upon the officer’s observations of the number of individuals assembled together, the manner of their dress and their use of certain hand signs and handshakes. Moreover, the officer’s extensive training and experience provide ample support for his conclusion. That the officer does not detail what specific future violent criminal activity the defendants were planning at the “universal meeting” does not render the information deficient. The facts alleged are enough to show that
*1113 the defendants were preparing to engage in the generalized “violent and tumultuous conduct” required by the statute. Additionally, the certainty of the officer’s conclusion, or the possibility that his conclusion is mistaken, is irrelevant at this juncture. The credibility and reliability of the officer or his assertions may be explored on cross-examination at trial. In a review of the information for facial sufficiency, the factual allegations must be accepted as true (CPL 100.40 [1] [c]). When accepted as true, the officer’s allegations are adequate to inform the defendants as to the nature of the charges against them (see Kalin, 12 NY3d at 231). The information therefore sufficiently pleads the elements of the charged crime and is not jurisdiction-ally defective. That there may be some other innocent explanation for the defendants’ conduct is an issue for trial. The People are not, for pleading purposes, required to disprove every conceivable defense (see People v Deegan, 69 NY2d 976, 979 [1987]; Barona, 19 Misc 3d 1122[A], 2008 NY Slip Op 50814[U], *3 [2008]). While the People must still meet their burden of proof beyond a reasonable doubt at trial, their much lower burden at the pleading stage has been met. The defendants’ motion to dismiss for facial insufficiency therefore is denied.
Remaining Motions as to Defendant Hernandez
The People are directed to provide discovery as required by CPL 240.20 and a bill of particulars as required by CPL 200.95 and 100.45 (4). The People are directed to comply with their continuing obligation to disclose exculpatory material pursuant to Brady v Maryland (373 US 83 [1963]). A Sandoval ruling is reserved to the trial court.
Remaining Motions as to Defendant Cuevas
Pursuant to CPL 240.43, the People are directed to notify the defendant of any prior uncharged criminal, vicious or immoral conduct which the People intend to use at trial to impeach the defendant’s credibility immediately prior to the commencement of jury selection and a Sandoval ruling is reserved to the trial court.
Remaining Motions as to Defendant Sanchez A Wade/Dunaway hearing is granted upon the defendant’s motion to suppress identification testimony. A Huntley/Dunaway hearing is granted upon the defendant’s motion to suppress statements. Pursuant to CPL 240.43, the People are directed to *1114 notify the defendant of any prior uncharged criminal, vicious or immoral conduct which the People intend to use at trial to impeach the defendant’s credibility immediately prior to the commencement of jury selection and a Sandoval ruling is reserved to the trial court.
Remaining Motions as to Defendant Quiles
The defendant’s motion to suppress physical evidence or in the alternative for a Mapp hearing is denied. Photographs of the defendant’s person taken by police officers are not physical evidence subject to suppression pursuant to Mapp v Ohio (367 US 643 [1961]). A Wade/Dunaway hearing is granted upon the defendant’s motion to suppress identification testimony. A Huntley/Dunaway hearing is granted upon the defendant’s motion to suppress statements. A Sandoval ruling is reserved to the trial court. The People are directed to provide discovery as required by CPL 240.20.

. In contrast, the offense of inciting to riot under Penal Law § 240.08, which punishes a person for “urg[ing] ten or more persons to engage in tumultuous and violent conduct of a kind likely to cause public alarm” punishes mere advocacy as opposed to preparation to commit an unlawful act. Accordingly, the requirement that the defendant’s actions constitute a “clear and present danger,” or an incitement to imminent lawless action, must be superimposed upon Penal Law § 240.08 to save it from constitutional overbreadth (see People v Tolia, 214 AD2d 57, 63-64 [1st Dept 1995], citing Brandenburg, 395 US at 447-448; see also People v Upshaw, 190 Misc 2d 704, 706 [Crim Ct, NY County 2002]).

. Judicial notice may be taken of current events that are relevant to a court’s decision (see e.g. Matter of Consolidated Edison Co. of N.Y. v Public Serv. Commn. of State of N.Y., 47 NY2d 94, 110 [1979] [“(i)t would not strain the bounds of judicial notice for us to take cognizance of the present energy crisis”]; Appelbaum v Deutsch, 111 AD2d 21, 22 [1st Dept 1985] [“(j)udicial notice can be taken of the fact that diplomatic missions these days draw opposition ranging from picketing to bombing”]). The Latin Kings’ reputation as a violent street gang is well known (Drago, Latin Kings Gang a “Cultural Association” in Barcelona, Inter Press Service News Agency, Sept. 21, 2009 [“The Latin Kings ... is now one of the largest and most organized gangs in the United States, with some 25,000 members in 34 states”], available at http://www.ipsnews.net/news.asp?idnews=34820; Tirella, Double Whammy: In Arresting Alleged Gang Member, Police Find Something Worse, The Hudson Reporter, Sept. 5, 2009; Kocieniewski, Not Scared, or Scalded, Into Silence, Ex-Gang Leader Takes Stand in Trenton Murder, New York Times, Sept. 28, 2007, at B2).