Sanders, J.
In this case, seven defendants face criminal charges which include attempted extortion, criminal harassment, threats, conspiracy, and (as to one defendant) stalking. The defendants now move to dismiss the indictments against them on several *309 grounds. Their principal argument is that the evidence presented to the grand jury was insufficient to support the indictments against them. Commonwealth v. McCarthy, 385 Mass. 160, 163 (1982). In pressing their motions, all of the defendants contend that the Commonwealth is targeting behavior that is constitutionally protected.
In considering these Motions, the Court has read the grand jury minutes and reviewed all grand jury exhibits. Those exhibits include videotaped recordings of four street demonstrations in which the defendants are depicted. In addition to memoranda of law submitted by the parties, this Court has also reviewed an amicus curiae brief filed by the National Lawyers Guild. After careful consideration of all of these materials, this Court concludes that the Motions must be Allowed in substantial part.
Factual Background
The grand jury that returned the indictments against these defendants heard evidence on three different days.[1] A substantial portion of that presentation pertained not so much to any specific acts committed by the named defendants but rather to activities of an organization called Stop Huntingdon Animal Cruelty, or “SHAC.” The group was originally formed in England in order to oppose animal testing by a British company called Huntingdon Life Sciences or “HLS.” SHAC’s avowed purpose is to put HLS out of business. In furtherance of that purpose, its members have engaged in criminal acts against HLS employees. In addition, SHAC has targeted businesses which provide services to HLS, and, using various tactics, has gone after employees of those businesses in an effort to pressure them into severing their ties with the British company. Those tactics include picketing, invading company offices, painting buildings with red paint, and publishing employee contact information on the SHAC website with a message encouraging people to send that employee a “present.”
In the spring of 2002, SHAC turned its attention to Robert Harper, who is a mid-level executive working for Marsh Incorporated in Boston (“Marsh”). Marsh provides insurance to HLS. On April 28, 2002, six people (none of them identified) appeared outside Harper’s home in the Back Bay where he lives with his wife and two-year-old son. The home is in a multi-level apartment building on Commonwealth Avenue in Boston. These six individuals held signs stating that “Marsh Insures Murderers” and “Marsh Kills Puppies.” They left after someone complained to them that they were disturbing the neighborhood. Subsequent to that, a report of the demonstration appeared on the SHAC website with the warning that “it was going to get worse for Robert Harper until Marsh severs their ties” with HLS. The website gave out Harper’s home phone number, address, and e-mail, and urged SHAC supporters to “Give Rob a call or send him a gift.”
Thereafter, the Harpers received hang up calls, and also got calls inquiring about a car for sale and concert tickets. It was discovered that Harper’s name and home telephone number appeared on fliers posted in Harvard Square regarding those items. In addition, the Harpers’ mail was rerouted to Arizona, and they received magazine subscriptions that they had not ordered. They also received inquiries from credit card companies which they had not contacted. On May 26, 2002 in the early morning hours, the Harpers were awakened by certain unidentified individuals using bullhorns. On Father’s Day weekend, several gallons of red paint were dumped on the front steps of the Harpers’ apartment building. Police had no names at this point to connect with any of these incidents. The most that could be said was that the perpetrators were supporters or members of the SHAC organization.
The first time that a specific defendant is connected to a particular activity relating to the indictments before this Court is in connection with a demonstration at the Harper home on June 29, 2002. The Court has viewed a videotape of that demonstration, which was taken by a private security company hired by the Harpers. On that date, defendants Kleinert, Smith, Doane, Lungarelli and Lotts chanted slogans and distributed fliers with Harper’s home telephone number and e-mail address on them. They shouted that “Rob Harper is a puppy killer” and held signs stating that “Marsh Insures Murderers.” In one chant (repeated many times in later demonstrations), the group yelled: “Stop the torture, Stop the pain; Rob Harper is to blame.” The next day, a report of the demonstration appeared on the SHAC website.
The June 29 demonstration was followed by other demonstrations occurring on July 2 through July 4, 2002 and again on August 9 through August 11, 2002. On two of those dates, the participants did not say anything but instead stood outside Harper’s apartment building with red candles, allowing the wax to drip onto the sidewalks. On the other dates, the participants held signs and engaged in group chants. Individuals in the group (chief among them defendant Kleinert) would occasionally shout statements directed at Harper. Defendant Gazzola, who first appeared at the August 9, 2002 demonstration and led many of the chants on that day, vowed that the group would continue to pursue Harper until his company severed its ties with HLS. She also alluded to the fact that Harper had red paint dumped at his doorstep and referred to other acts of harassment which had been directed against Marsh and HLS employees, asking “where were the police then?” These chants and statements are what form the primary basis for the Commonwealth’s case.
Apart from these demonstrations, the grand jury also heard the following. First, on July 17, 2002, a Superior Court judge issued a civil injunction (the “July 17 Order”) against SHAC and three of the named *310 defendants, Doane, Smith and Lungarelli. The July 17 Order prohibited them — and anyone “acting in concert” with them — from harassing or threatening the Harpers or any other Marsh employee and his or her family. The July 17 Order also required the defendants to stay at least fifty feet away from the Harpers and at least thirteen feet away from their property. Although the July 17 Order, together with the judge’s findings of fact, was presented to the grand juiy, grand jurors were specifically instructed not to read the fact findings. Therefore, that an order existed (without regard to why it was issued) was all that the grand jury was to consider.
Second, on August 17, 2002, defendants Lotts and Kleinert were stopped by police. Found in the course of a search of their motor vehicle were SHAC fliers, a bag of magazine subscription cards, a document entitled “20 Terror Tactics” which has appeared on SHAC’s website, and a computer disc which contained a document stating “Tell puppy killer Rob Harper what you think of him,” as well as other text which had appeared on the website. Many of the subscription cards had the name of John Spath, another Marsh executive which SHAC had targeted. A notebook found in the car listed the names and home addresses of attorneys who had brought the civil suit against SHAC; there were detailed instructions to their homes. Following this arrest, police conducted a search of Lotts’ apartment in Allston, Massachusetts. Kleinert, from New Jersey, had stated that he was staying at this apartment as well. Among other items, police seized prepaid calling cards, as well as fliers relating to concert tickets for sale, with Harper’s home telephone number.
Discussion
Although the defendants make many different arguments as to why this case should be dismissed, the grounds which this Court finds to be the most persuasive is their contention that, pursuant to Commonwealth v. McCarthy, the evidence presented to the grand jury is insufficient to support most if not all of the charges against them. It is certainly rare for a defendant to succeed on a McCarthy challenge, since the standard that the Court is to apply in determining the sufficiency of the evidence is probable cause to arrest. So long as there is trustworthy information sufficient to permit a prudent person to believe that the defendant committed the crime in question, the case must be allowed to proceed. Beck v. Ohio, 379 U.S. 89, 91 (1964); Commonwealth v. O’Dell, 392 Mass. 445, 449 (1989). In the instant case, however, the defendants contend that much of the evidence presented to the grand jury consisted of conduct which cannot, under the First Amendment to the United States Constitution, be the subject of criminal prosecution. To allow this case to proceed further, it is argued, would itself infringe on those constitutional guarantees and also set a dangerous precedent which could affect other organizations. Because I agree with the defendants that the case raises First Amendment concerns, the defendants’ motions deserve serious consideration.
This case implicates the First Amendment in two ways. First, the Commonwealth’s case relies heavily on the words that the defendants uttered in the course of otherwise peaceful protests. The constitutional guarantee of free speech, however, prevents the state from punishing the use of words which are not within that very narrow category of speech which is directed to inciting, and which will likely produce, imminent lawless action. Hess v. Indiana, 414 U.S. 105, 108 (1973), quoting Brandenburg v. Ohio, 395 U.S. 444, 447 (1969). Second, some portion of the Commonwealth’s case appears to be built on the defendants’ association with and support of SHAC, so that conduct which would otherwise be protected is cast in a more sinister light. Although the state is certainly entitled to prosecute any SHAC member who commits a criminal act, it is an entirely different matter for the state to seize upon mere participation in that organization as a grounds for prosecution. “The right to associate does not lose all constitutional protection merely because some members of the group may have participated in conduct or advocated doctrine that itself is not protected.” N.A.A.C.P. v. Claiborne Hardware Co., 458 U.S. 886, 908 (1982).
Turning to the issue of whether the words uttered by the defendants are constitutionally proscribed, this Court is mindful of the following principles. First, the words must be interpreted in the context in which they were made. See Commonwealth v. Sholley, 432 Mass. 721, 725 (2000). Here, those words occurred in the course of street demonstrations, as part of a responsive group chant or as some spontaneous statement shouted out by one or more of the protest’s placard-bearing participants. As the Supreme Court itself has recognized, language used in that context can often be “vituperative, abusive, and inexact,” but nevertheless be constitutionally protected. Watts v. United States, 394 U.S. 705, 708 (1969). For example, in Watts, the defendant’s statement that “(ijf they ever make me carry a rifle, the first man I want to get in my sights is LBJ” was not held to be a “true threat” punishable as such but was instead “political hyperbole” which was not a crime at all. Id. at 706, 708. Given the strong national commitment to uninhibited debate on public issues, courts are particularly reluctant to. allow persons to be prosecuted for what they say at an organized protest or political demonstration.
Second, there is a difference between the advocacy of the use of force on one hand and incitement to imminent lawless action on the other. A government which fails to draw this distinction so as to criminalize the former impermissibly intrudes upon First Amend *311 ment freedoms. Brandenburg, 395 U.S. at 447-48 (holding that KLu Klux Klansman’s statements to “buiy the niggers” and that “there might have to be some revengeance [sic] taken” were not subject to criminal punishment). Thus, advocacy of illegal action at some indefinite future time is constitutionally protected. See, e.g., Hess v. Indiana, 414 U.S. at 108 (holding that the defendant’s statement “we’ll take the fucking streets later/again” while sheriffs attempted to clear the streets could not be punished as “fighting words”). Even very strong and specific language does not transcend the bounds of protected speech set forth in Brandenburg if it is not followed by immediate violence. For example, Charles Evers, the N.A.A.C.P.’s field secretary, could not be the subject of even civil liability for public statements made in the course of a boycott of white businesses, even though he said, among other things: “If we catch any of you going in any of them racist stores, we’re gonna break your damn neck.” Claiborne, 458 U.S. at 902.
In arguing that the speech which is the subject of the instant prosecutions is not protected by the First Amendment, the Commonwealth relies in part on Frisby v. Schultz, 487 U.S. 474 (1988). That case, however, concerned the constitutionality of a city ordinance which banned single-residence picketing. It did not address the question of whether the government could, in the absence of such an ordinance, arrest and criminally prosecute those who conduct an otherwise peaceful protest on a busy public street.[2] Critical to the Supreme Court’s conclusion that the ordinance was constitutional was that it was content neutral, and permitted no exceptions to its application. Here where there is no specific prohibition to residential picketing, there can be no such assurance that the government is exercising its powers without regard to the content of the defendants’ message. The Court in Frisby did affirm the well-established principle that speech may be regulated as to time, place and manner, and it also highlighted the difference between speech directed at a single person who is not free to walk away and speech directed generally to the public. In line with these principles, this Court therefore sees no constitutional problem with the July 17 Order, nor is there any constitutional impediment which prevents the plaintiffs who obtained that order from seeking relief from a court in the event there is a violation. It does not follow, however, that, even without evidence that the July 17 Order was violated (see footnote 5, infrcij the government can base a criminal prosecution solely on the words of the defendants where those words fall outside that narrow class of cases which do not deserve constitutional protection.
Examining those statements allegedly made by the defendants in the instant case, I conclude that none of them constitute the kind of real threat that the Supreme Court has required in order for the speaker to be prosecuted criminally. That the group called Rob Harper a “monster,” a “murderer” and a “puppykiller” may be defamatory, for example, but that cannot constitute criminal harassment. That the defendants shouted to his neighbors that Harper has “blood on his hands” as a result of Marsh’s ties to HLS is an expression of political belief, however misguided and wrong that belief may be. When defendant Gazzola asked “where were the police” when red paint was dumped at the Harpers’ door step or when other Marsh or HLS employees were subjected to criminal acts, her statement was remarkably similar to a statement that Evers made in Claiborne, when he said at one protest that neither the chief of police nor the sheriff would be able to protect those businesses who broke the boycott. 458 U.S. at 902. It is certainly “strong language” but where the appeal does not itself incite immediate lawless action, it is protected speech.[3]
The closest that any of the defendants in this case came to uttering a true threat was in a chant, led by Gazzola, at the August 9, 2002 demonstration. In response to Gazzola shouting “what goes around comes around,” the group replied “bum his house to the ground.” The chant, repeated four times, was used during a single ten-second time period in a demonstration which lasted more than half an hour. It was not employed again, on that day or on any other day. When those words were uttered, some members of the group were smiling or laughing, and police officers stood nearby, seemingly unconcerned. There was no one-on-one confrontation or personal encounter with the Harpers at any time. Compare Shelley, 432 Mass, at 724, 726 (holding that there existed a “true threat,” not protected by the First Amendment, when the defendant, inches from the victim, pointed a finger and stated “watch out counselor”). Finally and perhaps most important, there was no indication that any defendant had the present ability or intent to carry out the threat, nor did any lawless action ensue. Indeed, around that same time, Gazzola cautioned the group to stay off the sidewalk so as to be in compliance with the civil injunction against them, suggesting an intent to conform to the law.
The constitutional principles set forth above are particularly critical to this Court’s determination as to the sufficiency of the evidence supporting these indictments. Where a criminal prosecution targets speech, the mere fact that a prosecution is instituted, without regard to the improbability of its success, has a chilling effect upon the exercise of First Amendment rights. See Dombrowski v. Pfister, 380 U.S. 479, 493 (1965). Moreover, the Court must interpret statutes wherever possible so as to avoid a constitutional issue. Blixt v. Blixt, 437 Mass. 649, 674 (2002); School Committee of Greenfield v. Greenfield Educ. Ass’n, 385 Mass. 70, 79 (1982). Accordingly, it is important that the laws *312 pursuant to which these defendants were indicted be construed so as to apply only to conduct which is not constitutionally protected. Because this Court concludes that the chants and statements that the defendants made in the course of street demonstrations is speech which cannot be subject to criminal punishment, it necessarily follows that indictments which rely exclusively on those public statements must be dismissed. The question is whether there is other conduct, apart from those statements, to support any of these charges against any one defendant. The Court now turns to that issue, examining each charge in turn.
All seven defendants are charged with the crime of threats. It is clear from the Commonwealth’s brief that this charge relies exclusively on the statements made in the course of the street protests.[4] The specific statement that the Commonwealth points to as the basis for this indictment is the chant, led by defendant Gazzola: “What goes around comes around, bum his house to the ground.” As the Commonwealth recognizes, a true threat under G.L.c. 275, §2 requires both the intention to inflict a crime on another, the ability to carry out that crime, and a justified and reasonable fear on the part of the victim. See, e.g., Commonwealth v. Robicheau, 421 Mass. 176, 183 (1995); Commonwealth v. Meier, 56 Mass.App.Ct. 278, 280 (2002). As discussed above, because of First Amendment concerns, the statement must be intended to and likely to produce imminent lawless action. Brandenburg, 395 U.S. at 447-48. Given the circumstances under which the defendants made the statements (and the fact that the statements were all captured on videotape so that the Court could see for itself what the circumstances were), these statements do not constitute the kind of true threats which are not constitutionally protected and thus punishable under G.L.c. 275, §2. Accordingly, the indictment for threats is not supported by probable cause.
All defendants are also charged with attempted extortion. Again, at the heart of that crime is the existence of a threat. Specifically, the statute requires that the defendants, through written or verbal communications, “maliciously threaten” to cause injury to the person or property of another in order to either extort money or other pecuniary advantage from that person, or compel him to do an act against his will. G.L.c. 265, §25. Without a true threat (and again, the only “threats” made here were the statements by the defendants in the course of the protests in front of Harper’s home), there can be no extortion. Moreover, it is difficult to see how this case involves the kind of coercion required to support a charge of extortion, particularly if one interprets the statute consistent with constitutional requirements. In support of the indictment for extortion, the Commonwealth argues that the defendants, through their statements at the demonstrations, engaged in unlawful coercion because their purpose was to pressure Harper and Marsh into severing their ties with HLS. The very purpose of speech in the context of a boycott or demonstration, however, is to influence theconduct of others; that coercive impact does not remove it from the reach of the First Amendment. Claiborne, 458 U.S. at 911. To hold that there is sufficient evidence in the instant case to support an indictment for extortion (even under the relaxed “probable cause” standard) would permit the statute to be wielded in an unconstitutional way, and set a dangerous precedent for the use of this law against other groups seeking to bring about some social or political change.
Finally, with this Court’s conclusion that there were no true “threats” leveled against Harper or anyone else, the charge of stalking (which is made only against defendant Kleinert) also must be dismissed. A key element of stalking, pursuant to G.L.c. 265, §43, is that the defendant make a threat to place another in imminent fear of death or bodily injury. See, e.g., Commonwealth v. Cruz, 424 Mass. 207, 210 (1997); Commonwealth v. Matsos, 421 Mass. 391, 394 (1995). The evidence the Commonwealth offers in support of this element is again the chants and statements made by Kleinert between June 29 and August 11, all in the course of the protests outside Harper’s home. Because this Court has concluded that these statements are constitutionally protected, it necessarily follows that the statements cannot support the threat necessaiy for a stalking charge.[5] Accordingly, this indictment must also be dismissed.
What remains of this case is the indictment for criminal harassment and the indictment that the defendants conspired with others to commit a crime. As to whether these indictments should be dismissed, the issue is whether, separating out the statements made at the June 29 through August 11 protests, there exists some other evidence of criminal conduct on the part of any specific defendant. Unlike the crime of extortion or stalking, criminal harassment does not require proof of a threat. Rather, the Commonwealth must demonstrate that the defendant engaged in a series of acts committed over a period of time which “seriously alarms” another person and is the kind of conduct that “would cause a reasonable person to suffer substantial emotional distress.” G.L.c. 265, §43A. I conclude that there is probable cause to arrest both Kleinert and Lotts (but no other defendant) for a violation of this statute. Certainly, the acts occurring in the spring 2002 which preceded the street protests are not protected by the First Amendment. But Kleinert and Lotts are the only defendants who can, based on the evidence presented to the grand jury, actually be linked to the commission of those acts.
*313 Acts which could constitute criminal harassment include the posting of fliers which advertised concert tickets and cars for sale and which listed Harper’s phone number, his receipt of unwanted magazine subscriptions and hangup calls, the rerouting of his mail to Arizona and the inquiries from credit card companies. The search of Lotts’ apartment and of the car which she and Kleinert were using linked both of these individuals to those incidents. That evidence also suggested that either or both of the defendants were responsible for putting together the SHAC website, which published Harper’s home phone number and urged people to send him a present or give him a call. Also appearing on that website was an account of the Father’s Day incident where red paint was dumped in front of Harper’s apartment building; one can reasonably infer from the evidence presented to the grand jury that Kleinert and/or Lotts were the authors of that account and thus personally participated in it. Lotts and Kleinert were among the group that, on July 2 in the early morning hours, dripped red candle wax outside Harper’s home. Finally, although Kleinert’s statements at the demonstrations would not alone be enough to support his prosecution, they are certainly probative of his intent to cause alarm to Harper and his family.[6]
As to the other defendants, there was no evidence presented to the grand jury which connected them to the acts described above, other than their membership and support of SHAC, and their attendance at rallies sponsored by that organization.[7] As this Court has already stated, however, mere association with an organization — even one whose members have committed criminal acts — cannot form the basis of a criminal prosecution. Claiborne, 458 U.S. at 909. Nor does the use of a conspiracy indictment assist the Commonwealth. Although the common-law definition of conspiracy in this state does not require proof of an overt act in furtherance of the conspiracy, it does require evidence of an unlawful agreement — that is, a combination of two or more persons who agree to commit a criminal act or who agree to use criminal means to accomplish a purpose not otherwise unlawful. Commonwealth v. Anselmo, 33 Mass.App.Ct. 602, 604 (1992); see also Commonwealth v. Pero, 402 Mass. 476, 478 (1988). Surely, evidence of such an unlawful agreement cannot exclusively depend (as it appears to here) on an individual’s choice to associate himself with a political group (even one whose members have committed criminal acts) or to participate in a rally advertised on a website widely accessible to the public. If it did, then the freedom of association and of assembly guaranteed by the First Amendment would mean very little indeed.
Conclusion and Order should be ALLOWED in that all indictments against defendants Gazzola, Lungarelli, Schwartz, Smith, and Doane are hereby DISMISSED, the evidence presented before the grand jury being insufficient to support probable cause to arrest those individuals on the charges set forth in the indictments. As to defendant Lotts and Kleinert, their Motions to Dismiss are ALLOWED, in part, so that the indictments against them are DISMISSED with ,the exception of the indictments accusing them of criminal harassment and conspiracy to commit that crime. As to those indictments, defendant Kleinert’s and Lotts’ Motions are DENIED.
Accordingly, for the foregoing reasons, this Court concludes that the Defendants’ Motions to Dismiss

Evidence was presented on August 28, 2002, September 6, 2002 and October 24, 2002. On November 20, 2002, without hearing any additional evidence, the grand jury voted to return these indictments.

Indeed, the Court in Frisby acknowledged that a residential street is as much a public forum as a commercial one. The question was not whether the First Amendment applied to speech at such a location but whether there was a compelling government interest sufficient to support the ordinance at issue.

At oral argument on these motions, the Commonwealth appeared to suggest that it would not be appropriate to equate the work of the N.A.A.C.P. in the segregated South with that of animal rights extremists. The First Amendment, however, protects even those groups with the most despicable of goals. See, e.g., Brandenburg, 395 U.S. at 447 (protecting speech of the Klu Klux Klan). Indeed, this Court extends constitutional protections to the defendants in spite of — not because of— their message, the content of which is irrelevant for First Amendment purposes.

Although the Commonwealth also cites the incidents of harassment leading up to the public demonstrations, it does so only insofar as those incidents bear on the Harpers’ state of mind when the protesters stood outside their building. There is no evidence (nor does the Commonwealth suggest) that these prior incidents themselves involved any threats to do bodily harm to Harper, even assuming that they could be tied to any of the named defendants.

The Commonwealth had initially alleged that there was a violation of the July 17 Order; where there is a violation of a restraining order, no evidence of a threat is required. At the oral arguments on these Motions, however, the Commonwealth acknowledged that there was insufficient evidence to support a violation of the July 17 Order, and filed a Partial Nolle Prossequi as to that portion of the Indictment against Kleinert which alleged as much.

For example, at the June 29 demonstration, Kleinert yelled: “wherever you go we will be watching you ... we will never leave you alone ... We will be on your doorstep. We will be following you around. The animal rights movement will be all over your ass.”

Gazzola, by her statements at those rallies, did show that she knew about the red paint being dumped at Harper’s home. But knowledge that a crime has been committed, without more, is not enough to support even a probable cause determination that the defendant is the perpetrator.