# IN THE SUPREME COURT OF TENNESSEE
## AT KNOXVILLE
January 5, 2011 Session

## STATE OF TENNESSEE v. TEDDY RAY MITCHELL

**Appeal by Permission from the Court of Criminal Appeals**
**Circuit Court for Hamblen County**
**No. 06CR464      John F. Dugger, Jr., Judge**

---

**No. E2008-02672-SC-R11-CD - Filed March 31, 2011**

---

SHARON G. LEE, J., concurring in part and dissenting in part.

I write separately to dissent from the majority's decision to affirm the defendant's conviction for disorderly conduct. After giving proper deference to the jury's verdict, I cannot agree that the evidence is sufficient to support Mr. Mitchell's conviction for disorderly conduct. Moreover, I conclude that Mr. Mitchell's conduct was protected as free speech.

An anti-immigration rally was planned for the afternoon of June 24, 2006, on the lawn of the Hamblen County Courthouse. The rally organizers encouraged participants to attend and "wave the American flag proudly and display signage that educates." Teddy Mitchell attempted to do just that, but was arrested before he could enter the rally.

Anticipating a possible confrontation between pro-immigration and anti-immigration participants at the rally, the Hamblen County Sheriff's Department assembled between eighty and ninety police officers from various police agencies in and around the rally site. The police presence included officers from the Hamblen County Sheriff's Department, the Morristown Police Department, the Sevierville Emergency Rescue Squad, and the Tennessee Highway Patrol. Most of the officers were in uniform; some were in riot gear, many were in full body armor and carried loaded M-16 weapons; and others carried AK-47 weapons. Police officers were on the ground, snipers on rooftops, and a half-track tank was hidden in the bushes of the courthouse lawn.

Parking around the courthouse was restricted. When Mr. Mitchell attempted to park in a restricted area, he had a verbal exchange with two police officers and used a racial

epithet.  As Mr. Mitchell drove off to park his car elsewhere, the two officers walked to the rally entrance and told the officers there "Hey, this guy coming, he's mad."  Mr. Mitchell, then sixty-one years old, arrived at the rally entrance carrying in his right hand a soft drink can and in his left hand an American flag, poster, and a folding lawn chair.  There were at least seven officers standing at the sidewalk entrance to the courthouse lawn.  As Mr. Mitchell attempted to enter the sidewalk, he was stopped by Officer Stuart and was told that he could not take his flag into the rally.  Mr. Mitchell protested loudly.  On the video, he can be heard saying "Can you take the damn Mexican flag in there?  Can you take the Mexican flag in there? You are telling me that American flag . . . ."  The videos depict a scene where Mr. Mitchell is agitated, but the police officers and bystanders appear undisturbed by Mr. Mitchell's conduct.  Indeed, not a single person testified that he or she felt threatened by Mr. Mitchell.

At this point, an order came across the radio from Officer Weisgarber, who was stationed next to the courthouse, to remove Mr. Mitchell.  Officer Weisgarber never saw Mr. Mitchell until *after* his arrest.  Officer Stuart, who made the arrest, explained:

> An order came across the radio to remove Mr. Mitchell.  A place like this right here at times other than the news that you see on a rally of this effect, one person causing a problem can get the whole crowd of people irate and it could escalate real quick.  So, we thought we would eliminate the problem and everyone else could have a peaceful rally.

When asked what Mr. Mitchell did that was disorderly conduct, Officer Kyle, who also participated in the arrest, explained "Sir, when you cause a scene in public you are disorderly."

### *Sufficiency of Evidence*

Mr. Mitchell was arrested and indicted for disorderly conduct and resisting arrest.  He was found not guilty of resisting arrest, but was convicted of the crime of disorderly conduct.  At trial, the state had the burden of proving beyond a reasonable doubt that Mr. Mitchell was 1) "in a public place," 2) "with intent to cause public annoyance or alarm," and 3) "engag[ing] in . . . *violent or threatening* behavior."  Tenn. Code Ann. § 39-17-305(a)(1) (2003) (emphasis added).

Although Mr. Mitchell's conduct was rude and belligerent, the fatal flaw in the State's case was its failure to establish that Mr. Mitchell's conduct was violent or threatening.  There is an important and critical distinction between belligerence and violent or threatening

2

conduct. "Belligerent" is defined as "[g]iven to or marked by hostile or aggressive behavior." State v. Millsaps, No. 03C01-9409-CR-00313, 1996 WL 397445, at *2 (Tenn. Crim. App. July 17, 1996) (quoting The American Heritage Dictionary of the English Language (1969)). To be considered threatening behavior, belligerent behavior must be combined with an "overt act or direct threat of harm." Id.; see also State v. Melton, No. M1999-01248-CCA-R3-CD, 2000 WL 1131872, at *7 (Tenn. Crim. App. Aug. 4, 2000). "Violent" behavior is defined as follows: "1. Of, relating to, or characterized by strong physical force. 2. Resulting from extreme or intense force. 3. Vehemently or passionately threatening." Black's Law Dictionary 1564 (7th ed. 1999).

This distinction between belligerent behavior and violent or threatening behavior was evident in Millsaps. Police officers responded to a disturbance call at a restaurant and learned that the defendant had been a participant in the disturbance. Id. at *1. When the officers asked the defendant to step outside for additional questioning, the defendant became "belligerent," refused to go with them, and "toss[ed]" his car keys at one of the officers. Id. Once he was outside, the defendant began "cussing," "hollering," and became "very belligerent." Id. Although the police officers testified that the defendant's actions were violent or threatening, neither officer regarded the defendant's tossing of his car keys as threatening or menacing. Id. at *2. The Court of Criminal Appeals reversed the disorderly conduct conviction, finding that the "[b]elligerent actions do not rise to the level of violent or threatening." Id.

The distinction between belligerent behavior and violent or threatening behavior was also evident in State v. Scott, No. 17, 1989 WL 22736 (Tenn. Crim. App. Mar. 16, 1989). In Scott, the defendant became upset with the local sheriff for arresting her husband for reckless driving. Id. at *1. Upon her husband's arrest, which the defendant apparently thought was not warranted, she and two other individuals who were present "mounted a loud, profane and lewd verbal assault on the sheriff." Id. As a grand finale, she flung a cup of ice across the parking lot and called the sheriff a "fat son of a bitch." Id. She was convicted of breach of the peace. In reversing the conviction, the Court of Criminal Appeals held that the defendant's words were mere insults and that there was no evidence that she had threatened or counseled any physical assault on the sheriff. Id. Further, the sheriff did not appear to be "greatly stirred by the insults." Id. The court did note that the sheriff had a concern that there was a crowd present and things could get out of hand: "[i]t is reasonable to infer . . . the sheriff believed he was faced with an explosive situation and made the arrest to prevent violence." Id. at *3. However, the court held that this was an insufficient reason to arrest the defendant because the "'clear and present danger' test requires the reviewing court to make its own inquiry into whether the 'danger' existed." Id. (citing Landmark Commc'ns, Inc. v. Virginia, 435 U.S. 829 (1978)). Accordingly, in reversing the conviction, the court emphasized that the defendant had not threatened anyone with physical assault, that there was

3

no evidence that members of the crowd present were "incited or inclined to intervene," and that "there was no 'clear and present danger' of violence to weigh against her right of free expression." Id.

Other decisions reveal what *is* required for the State to establish "threatening conduct" for a disorderly conduct conviction. In State v. Creasy, 885 S.W.2d 829 (Tenn. Crim. App. 1994), the defendant was arrested for disorderly conduct after calling a police officer a number of profane and insulting terms, clenching his fist, and pointing his finger at the officer. Id. at 831. On appeal, the court noted that the "words" were not sufficient to establish disorderly conduct but that the defendant's words coupled with clenching his fist and pointing his finger at the officer constituted "threatening behavior" and supported the conviction. Id. at 832. Moreover, the court specifically emphasized the officer's testimony that he felt "personally threatened." Id.

In State v. Roberts, 106 S.W.3d 658 (Tenn. Ct. App. 2002), the defendant was adjudicated delinquent based on his disorderly conduct in getting into a heated discussion with a school official and stating, "I'll take care of you." Id. at 661. After the official called 911, the defendant told the official to "come on outside" and made gestures indicating that the official should come outside; the official interpreted the defendant's actions as threatening. Id. On appeal, the court noted that "mere verbal epithets, unless the epithets can be considered 'fighting words,' cannot by themselves support a conviction under Tennessee's disorderly conduct statute." Id. at 663. "Verbal epithets accompanied by some physically threatening behavior, however, will support a conviction under our disorderly conduct statute." Id. (citing Creasy, 885 S.W.2d at 831-32). In affirming the conviction, the court noted that the defendant's statements "were threatening in nature" and emphasized the official's testimony that he felt apprehensive and threatened. Roberts, 106 S.W.3d at 663.

Likewise, in Melton, the defendant was convicted of disorderly conduct after refusing to move his illegally parked truck as instructed by a police officer, calling the officer a number of profane names, and throwing his driver's license at the officer, striking him in the chest. 2000 WL 1131872 at *2. The police officer, who described the defendant as over six feet tall and two hundred and fifty pounds, testified that he felt threatened because "thrown items can be used to distract an opponent while attempting to find a means of attack." Id. In affirming the conviction, the court distinguished both Scott and Millsaps:

> [W]e note that, unlike the defendant in Scott, the appellant did not throw his driver's license across the parking lot. Rather, like the defendant in Creasy, he directed his action at the police officer. Moreover, unlike the defendant in Millsaps, the appellant did not "toss" his driver's license in the direction of the officer. Rather, he threw the license with sufficient force to strike the officer

4

in the chest. . . . *Finally, unlike the officers in* <u>Millsaps,</u> *[the police officer] testified that the appellant's behavior in throwing the driver's license appeared menacing.*

<u>Melton</u>, at \*7 (emphasis added); <u>see also</u> <u>State v. Bason</u>, E2000-02276-CCA-R3-CD, 2001 WL 1152820 (Tenn. Crim. App. Oct. 1, 2001) (defendant convicted of disorderly conduct after cursing at police officers, screaming, and reaching into his pocket that contained a knife); <u>State v. Moore</u>, No. 03C01-9904-CR-00133, 1999 WL 1125235 (Tenn. Crim. App. Dec. 9, 1999) (defendant convicted of disorderly conduct after cursing at officers, swinging his arms, and kicking at officers).

After considering the principles in these cases and the evidence in the record before us, I am convinced that the proof was not sufficient to sustain the conviction for disorderly conduct. In vociferously challenging the officers' authority to deny him permission to enter the rally with his American flag, there is no doubt Mr. Mitchell was rude, loud, and belligerent. However, the entire verbal exchange between the numerous officers and Mr. Mitchell appears to have lasted *less* than 15 seconds. There was no proof that Mr. Mitchell made any threats of violence. There was no proof that any of the seven police officers at the entrance felt threatened at any time by Mr. Mitchell. There was no proof that Mr. Mitchell committed any act of violence toward any of the police officers or counseled others to do so. Although the State argues that Mr. Mitchell "shook the flag pole and poked Officer Wallen two or three times with the eagle attached to the end of the flag pole," this argument is simply not supported by the videotapes that captured the entire encounter. Obviously, the jury's role is to resolve conflicts in the proof; however, the State's argument that Mr. Mitchell used his flag to poke Officer Wallen in a threatening or violent manner and that this conduct somehow took place outside of the video cameras' view is sheer conjecture.

Accordingly, even after giving the jury's verdict the deference to which it is entitled, I conclude that a rational jury could have found Mr. Mitchell to be belligerent, rude, or loud, but no rational jury could have found him guilty of violent or threatening behavior beyond a reasonable doubt. I would reverse and dismiss the disorderly conduct conviction.

*Free Speech*

Given the absence of violent or threatening conduct, it is clear that Mr. Mitchell was arrested because the officers feared he would incite others to become irate; indeed, Officer Kyle admitted that Mr. Mitchell was arrested for "causing a scene in public," which he equated with being "disorderly." Although the State did not address the free speech implications of this case in its brief before this Court, it argued in its brief before the Court of Criminal Appeals that Mr. Mitchell's actions were not protected free speech because they

5

"had the potential to create a dangerous situation, given the proximity of the offense to others attending the rally."

"'The First Amendment reflects a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.'" Snyder v. Phelps, ___ U.S. ___ , No. 09-751, 2011 WL 709517, at *5 (2011) (quoting N.Y. Times v. Sullivan, 376 U.S. 254, 270 (1964)). "[S]peech concerning public affairs is more than self-expression; it is the essence of self-government." Connick v. Myers, 461 U.S. 138, 145 (1983) (quoting Garrison v. Louisiana, 379 U.S. 64, 74-75 (1964)). Speech concerns a public matter when it can "be fairly considered as relating to any matter of political, social, or other concern to the community." Id. at 146. "'[I]n public debate, [we] must tolerate insulting, and even outrageous, speech in order to provide adequate 'breathing space' to the freedoms protected by the First Amendment.'" Snyder, 2011 WL 709517, at *9 (quoting Boos v. Barry, 485 U.S. 312, 322 (1988)).

There is no question that Mr. Mitchell's words and conduct at a public rally on the topic of immigration concerned a matter of "public, social, or other concern to the community." Connick, 461 U.S. at 146. This does not mean, of course, that there were no limits to Mr. Mitchell's conduct; for example, the United States Supreme Court historically has excluded so-called "fighting words" from the ambit of free speech protection. In Chaplinsky v. New Hampshire, 315 U.S. 568 (1942), the defendant was convicted for cursing a municipal officer; in upholding the conviction, the Court said that "[t]here are certain well-defined classes of speech, the prevention and punishment of which has never been thought to raise any Constitutional problem." Id. at 571-72. The Court then described "insulting or fighting words – those which by their very utterance inflict injury or tend to incite an immediate breach of the peace." Id. at 572.

Since Chaplinsky, the Supreme Court's "fighting words" cases have focused primarily on whether a defendant's words or conduct incited imminent unlawful behavior or violence. In Cohen v. California, 403 U.S. 15, 20 (1971), for example, the Court emphasized that the defendant's speech, (in the form of a jacket that said "Fuck the Draft"), was not a "direct personal insult," and did not create a clear and present danger of a violent physical reaction. Likewise, in Bradenburg v. Ohio, 395 U.S. 444, 447 (1969), the Court stated that "free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." See also Hess v. Indiana, 414 U.S. 105 (1973) (concluding there was no present threat of imminent lawless action).

Importantly, the Supreme Court has applied these principles in several cases involving a citizen's encounters with police officers. In Norwell v. City of Cincinnati, Ohio, 414 U.S. 14, 16 (1973), the Court reversed a conviction under an ordinance prohibiting "noisy, boisterous, rude, insulting or disorderly" conduct. The Court stated:

[T]he petitioner was arrested and convicted merely because he verbally and negatively protested [a police officer's] treatment of him. Surely, one is not to be punished for nonprovocatively voicing his objection to what he obviously felt was a highly questionable detention by a police officer. Regardless of what the motivation may have been behind the expression in this case, it is clear that there was no abusive language or fighting words.

Id. Similarly, in Gooding v. Wilson, 405 U.S. 518 (1972), the Court reversed the conviction of a defendant who told officers: "White son of a bitch, I'll kill you." Likewise, our Tennessee courts have recognized these principles. See Creasy, 885 S.W.2d at 831 (Defendant's "words were not 'fighting words' because they neither inflicted nor tended to incite an immediate breach of the peace."); see also Roberts, 106 S.W.3d at 663 ("[M]ere verbal epithets, unless the epithets can be considered 'fighting words,' cannot by themselves support a conviction under Tennessee's disorderly conduct statute.").

Application of these vital constitutional protections necessarily involves a close, case by case analysis. Here, the State's brief before the Court of Criminal asserted that "the proof reveals [Mr. Mitchell] was arrested for disorderly conduct after he publicly approached officers in a loud, abrasive manner designed to call attention to his frustration over the flag pole restriction." This characterization, with which I would completely agree, demonstrates that Mr. Mitchell may have been "loud," "abrasive," and "frustrated," but he was not violent or threatening; thus, the State's argument does nothing to limit the free speech implications of this case.

The State's brief in the Court of Criminal Appeals, in an apparent reference to the standards in Cohen and Brandenburg, also asserted that Mr. Mitchell's "actions had the potential to create a dangerous situation, given the proximity of the offense to others attending the rally." The State cited officers' testimony that Mr. Mitchell's conduct "could get a whole crowd of people irate" because he was "creating a scene," and that officers needed to "eliminate the problem." This, however, is the Achilles' heel in the State's position. Mr. Mitchell's belligerent encounter with officers, during which he carried a drink, a chair, a flag, and a poster, lasted less than 15 seconds. None of the officers testified they felt threatened during the encounter. There was no evidence that Mr. Mitchell incited or produced imminent lawless action by others or that his behavior was likely to incite or produce such action. Not a single rally attendee testified to this effect, and the videotapes

7

do not support the conclusion. Officers' mere speculation as to what *may* have happened was not a basis to arrest Mr. Mitchell for boisterously expressing his views on a matter of public concern. Therefore, I would hold that Mr. Mitchell's conduct was protected free speech under the First Amendment.

*Evidence of Defendant's Statements*

I concur with the majority's conclusion that the trial court did not abuse its discretion in admitting into evidence statements Mr. Mitchell made to police officers while he was attempting to park his automobile before his arrival at the entrance to the rally and before his arrest for disorderly conduct. Although I do not think the statements were particularly relevant on the issue of whether he was guilty of disorderly conduct, I cannot say that it was an abuse of discretion to admit the evidence.

**Conclusion**

After giving proper deference to the jury's verdict, I cannot agree that the evidence is sufficient to support Mr. Mitchell's conviction for disorderly conduct. I conclude that absent evidence of violent or threatening conduct, Mr. Mitchell's conduct, in which he protested his inability to "wave the American Flag proudly" at a rally on an issue of public concern, was protected speech.

_____
SHARON G. LEE, JUSTICE