The Honorable Charles R. Fuqua State Representative 3907 Lankford Street Springdale, Arkansas 72762-6552
Dear Representative Fuqua:
This official Attorney General opinion is rendered in response to certain questions you have raised concerning two ordinances of the City of Springdale, which regulate the distribution of certain types of printed material. Copies of the two ordinances are attached to this Opinion.
Regarding the ordinances, you have asked:
 (1) Do these ordinances apply to the distribution of political literature?
 (2) Do these ordinances violate any provision of the United States Constitution, the Arkansas Constitution, or state or federal law?
(3) What penalty would a person violating these ordinances face?
RESPONSE
Before proceeding to address your specific questions, I must note that the Office of the Attorney General concerns itself primarily with matters of state law, and does not ordinarily construe the language of municipal ordinances. The construction of such ordinances necessarily involves a determination of the intent of the city council, a factor that this office is not well situated to consider and address. It also requires a consideration of other factors of which this office is unaware that could reflect a particular intent on the part of the city council that is not apparent from the face of the ordinance. The awareness of such factors is a matter within the local domain, rather than the domain of this office. The construction of the ordinance about which you have inquired therefore must ultimately be handled through a medium that can consider such local matters, such as a court. For this reason, I am unable to opine conclusively as to the proper interpretation of the two ordinances about which you have inquired.
Nevertheless, to the extent that you have raised matters that do not require a familiarity with local matters, I can respond to your questions.
Question 1 — Do these ordinances apply to the distribution of politicalliterature?
While a consideration of local factors with which I am unfamiliar may indicate a different intent on the part of the city council, it is my opinion, based solely on a consideration of the face of the ordinances, that the ordinances appear to define the term "noncommercial handbills" (which the ordinances purport to regulate) in a manner that is broad enough to encompass political literature. The definition of "noncommercial handbills," as used in both ordinances, is stated as follows:
 Noncommercial handbill shall mean and include any printed or written matter, any sample of device, circular, leaflet, pamphlet, newspaper, magazine, paper booklet, or any other printed or otherwise reproduced original or copies of any matter or literature not included in the aforesaid definitions of a commercial handbill.
Springdale City Code, §§ 74-17 and 74-17.
The above-quoted definition appears to be broad enough to encompass political literature. Again, however, I note that the city council may not have intended this definition to be broadly interpreted, and that a consideration of factors bearing upon the council's intent with regard to the ordinances may dictate a different conclusion. As indicated previously, my conclusions regarding this question are based solely on a consideration of the face of the ordinance, without the benefit of a consideration of all relevant local factors. These local factors must be evaluated before a definitive conclusion can be drawn regarding the correct interpretation of the ordinances.
Question 2 — Do these ordinances violate any provision of theUnited States Constitution, the Arkansas Constitution, or state or federallaw?
I must note initially that I can address this question only to the extent that it refers to the face of the ordinances. I cannot opine as to the legality of the ordinances as they may be applied. That is, the ordinances could conceivably be applied in a host of fact situations that could give rise to claims of illegality. Because of the myriad of possible factual scenarios, I cannot opine generally as to the legality of the application of the ordinances.
However, I can discuss the constitutionality of the language of the ordinances, as well as their facial legality in a non-constitutional context.
The U.S. Constitution
As a preliminary matter, I note that legislation is presumed to be constitutional, and the burden of showing otherwise is on the party asserting the legislation's unconstitutionality. Laudan v. State,322 Ark. 58, 907 S.W.2d 131 (1995).
The ordinances about which you have inquired implicate the "freedom of speech" provision of the First Amendment to the U.S. Constitution. These ordinances purport to regulate the distribution of commercial and non-commercial handbills on both public and private property. More specifically, they prohibit the placing of any commercial or non-commercial handbill on automobiles parked on public or private property. However, the ordinances do allow the distribution of both commercial and non-commercial handbills to any occupants or owners of such automobiles who are willing to accept the handbills.
Because these ordinances appear to be broad enough to regulate both speech that is protected under the First Amendment and speech that is unprotected under the First Amendment,[1] and because it regulates speech on both public and private property, it will be necessary to evaluate the ordinances under the various applicable standards. Because some elements of these standards involve questions of fact that I am unable to address, I cannot draw any definitive conclusions. However, I can provide you with the legal parameters that must be considered in evaluating the ordinances.
The U.S. Supreme Court has held that no form of speech deserves greater protection than "core political speech," and has therefore applied its strictest standard (which the Court described as "exacting scrutiny") to governmental action that burdens "core political speech." See McIntyrev. OH Election Com'n, 514 U.S. 334 (1995). Under the "exacting scrutiny" that the court has applied to governmental action that burdens "core political speech," the governmental action will be upheld only if it is narrowly tailored to serve an overriding state interest. Id.
The Court has established a "middle-tier" standard for evaluating regulation of protected commercial speech. Under that standard, a regulation restricting commercial speech that is true and non-misleading will be upheld if there is a "reasonable fit" between the regulation and the government's purpose in enacting the regulation. See Cincinnati v.Discovery Network, 507 U.S. 410 (1993); Board of Trustees of StateUniversity of N.Y. v. Fox, 492 U.S. 469 (1989); Central Hudson Gas Elec. Corp. v. Public Service Com'n of New York, 447 U.S. 557 (1980).
Finally, governmental entities can regulate protected speech (including the distribution of printed materials) on both public and non-public property, within certain limitations. The government can place reasonable restrictions on the time, place, and manner in which such speech is exercised. See Schenck v. Pro-Choice Network, ___ U.S. ___ (1997). If the speech takes place in a "public forum," the government can impose content-based restrictions only if the restriction is necessary to serve a compelling government interest, and if it is narrowly drawn to achieve that end. If the restriction in this public forum is content-neutral, it must burden no more speech than is necessary to serve a significant government interest, and must leave open alternative channels for expression. Id.; see also Donrey Communications v. City of Fayetteville,280 Ark. 408, 660 S.W.2d 900 (1983). If the speech takes place in a "non-public forum," the government can also impose time, place, and manner restrictions, provided that the restrictions are reasonable and viewpoint-neutral. International Society for Krishna Consciousness v.Lee, 505 U.S. 672 (1992), citing Perry Ed. Ass'n. v. Perry LocalEducators' Ass'n., 460 U.S. 37 (1983).
The ordinances about which you have inquired appear facially to be content-neutral and viewpoint-neutral. That is, they do not single out for regulation handbills containing any particular content or expressing any particular viewpoint. Although the ordinances do differentiate between commercial and non-commercial handbills, they impose the same restrictions on both types of handbills. From the face of these ordinances, it appears that they simply restrict the placement of all handbills, both commercial and non-commercial, on automobiles parked on public or private property.
The ordinances do not entirely squelch the regulated protected expression, in that they do allow the distribution of the regulated handbills to the owners and occupants of vehicles if those individuals are willing to accept them. However, the question of whether this provision would constitute and adequate alternative channel for expression is one of fact.
In any event, because the ordinances do restrict protected expression to an extent, a crucial aspect of a constitutional analysis of the ordinances under all of the applicable standards will be a consideration of the relationship between the degree of burden on speech and the interest the city seeks to serve through the ordinances. This consideration inherently involves questions of fact. The city government's purpose for the ordinances is not stated in the ordinances, nor have I been provided with this information. I therefore cannot engage in an analysis of this aspect of the ordinances under the various standards. This analysis must be undertaken, however, in order to determine the constitutionality of the ordinances.
Although the federal cases involving the regulation of handbills are not directly on point with the situation you have described, they can provide a point of reference for evaluating the ordinances. The U.S. Supreme Court most recently considered the regulation of handbills in McIntyrev. OH Election Com'n, 514 U.S. 334 (1995). That case involved an Ohio law that prohibited the distribution of campaign literature that did not contain the name and address of the person issuing the literature. McIntyre was fined for distributing handbills concerning a proposed tax levy, without including her name and address in the handbills. She argued that the Ohio law violated the First Amendment. The U.S. Supreme Court agreed. Applying the "exacting scrutiny" standard, the Court held that the law was not sufficiently narrowly tailored to serve the government's stated interest of preventing fraudulent and libelous statements concerning elections, or its interest in providing the electorate with relevant information. The inclusion in the handbill of the issuer's name and address, the Court pointed out, would not further the reader's ability to evaluate the information in the handbill. The Court noted that the prohibition encompassed all documents, whether or not they were arguably false or misleading. The Court struck down the Ohio law as being in violation of the First Amendment.
The Court also recently addressed a regulation that impacted the distribution of printed materials in Cincinnati v. Discovery Network,507 U.S. 410 (1993). In that case, the city revoked the permits of certain newstand vendors on the basis of a city ordinance that prohibited the distribution of "commercial handbills" on public property. The city's stated purpose for the ordinance was the safety and appearance of its sidewalks and streets. The Court found that there was not a "reasonable fit" between the ordinance and the city's stated purpose for the ordinance. The safety and beautification benefits to be derived from removing the newstands were small. Accordingly, the Court held the ordinance to be unconstitutional.
These two case-law examples illustrate the fact-intensive nature of an inquiry into the constitutionality of a law that impacts upon the freedom of speech. It is with this factual element in mind that the city should evaluate its ordinances under the various applicable standards, carefully considering its purpose for the ordinances, and the degree to which the ordinances fulfill that purpose.
The Arkansas Constitution and Other State or Federal Law
Article 2, § 6 of the Arkansas Constitution provides for freedom of speech. This provision has not been interpreted to provide any greater general protection than is provided by the U.S. Constitution. My analysis of the ordinances about which you have inquired under the Arkansas Constitution would therefore yield no different result from that reached under my analysis of them under the U.S. Constitution.
Finally, I find no state or federal statutory laws that address the validity of these ordinances.
Question 3 — What penalty would a person violating these ordinancesface?
I am unable to answer this question, because the answer will depend entirely upon the particular facts of each situation. The ordinances do not set forth a prescribed penalty for violation. Accordingly, the court hearing the matter will determine the penalty, which could vary depending upon the particular violation alleged, as well as the relief requested.
The foregoing opinion, which I hereby approve, was prepared by Assistant Attorney General Suzanne Antley.
Sincerely,
WINSTON BRYANT Attorney General
WB:SBA/cyh
[1] The First Amendment does not protect all speech. Governmental entities can widely restrict speech that has been held to be un-protected by the First Amendment (such as speech that is obscene, defamatory, or inciteful, see Miller v. California, 413 U.S. 15 (1973); Dun andBradstreet v. Greenmoss Builders, 472 U.S. 749 (1985); Brandenburg v.Ohio, 395 U.S. 444 (1969)), but it can only regulate protected speech (such as speech that is political or commercial, see McIntyre v. OHElection Com'n, 514 U.S. 334 (1995); Virginia State Bd. of Pharmacy v.Virginia Citizens Consumer Council, 425 U.S. 728 (1976)) within certain limitations. Some of the handbills that are prohibited by the ordinances about which you have inquired could constitute speech that is protected under the First Amendment. For example, some handbills that would fall within the ordinances' broad definition of "non-commercial" handbills could constitute protected political speech. In addition, some of the "commercial" handbills could constitute the type of commercial speech that has been held to be protectable under the First Amendment.