FILED
COURT OF APPEALS
DIVISION II

2013 JUN 11 AM 10: 40

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 42268-9-II |
| Respondent, | |
| v. | |
| JACOB HUBBLE, | UNPUBLISHED OPINION |
| Appellant. | |

PENOYAR, J. — Jacob Hubble appeals his first degree robbery conviction. He argues that the trial court improperly closed the courtroom three times to discuss three issues: the number of alternate jurors, a motion in limine, and jury instructions. Hubble also argues that the prosecutor improperly commented on Hubble's exercise of his right to remain silent and that the accomplice liability statue is unconstitutionally overbroad. We conclude that no improper closure occurred because none of the proceedings Hubble singles out here has historically been held in open court and thus his claims fail the "experience and logic" test. We also conclude that the prosecutor's comment was an acceptable missing-witness argument and not a comment on Hubble's silence. Finally, we have recently held that the accomplice liability instruction is not overbroad. We affirm.

## FACTS

### I. FACTUAL BACKGROUND

In the early morning hours of August 9, 2010, Jeremy Allison was at his trailer with Emerald Culberg and her friend, Sandra. Culberg claimed they went to Allison's home that morning to smoke methamphetamine, asserting that all three did, though in varying amounts. Allison admitted he and Culberg were going to smoke the drug that morning, but denied that

anyone ended up doing so. Allison and Culberg had exchanged text messages that morning about meeting at his trailer and, once there, about Sandra's presence.

While at Allison's trailer, Culberg sent a text message to Jacob Hubble, her boyfriend.[1] Shortly after, Hubble and another man identified only as "Mike" drove up into Allison's driveway. Report of Proceedings (RP) (Nov. 18, 2010) at 94. At this point, Allison's and Culberg's accounts of what happened next diverge markedly.

According to Allison, Hubble and Mike came through the trailer door. Hubble pulled a "three-cell" Maglite flashlight out of his pocket and started questioning Allison about text messages he had sent to Culberg. RP (Nov. 18, 2010) at 38. When Allison reached behind him to get his phone so he could show Hubble the text messages, Hubble tried grabbing the phone out of Allison's hand. As Allison and Hubble wrestled over the phone, Hubble told Mike to grab Allison's safe, which was on the bed behind Allison. When Mike grabbed the safe's handle, Allison let go of the phone and grabbed Mike's wrist. Allison claims that Hubble then hit him over the head with the flashlight, though Allison did not see Hubble hit him. The blow split Allison's scalp open. Agitated, Allison pushed Hubble and Mike onto his couch, grabbing the flashlight out of Hubble's hand. Allison began swinging back. Hubble and Mike ran out the trailer door and quickly drove away. Allison's keys, phone, and safe, which had all been in his trailer before this incident, were now missing.

---

[1] Culberg stated that because "[Allison] kept hitting on me, getting more irritated I wouldn't get rid of Sandra," she sent Hubble a text message, asking him if he could pick her up, though she claims she did not tell him why. RP (Nov. 18, 2010) at 91. Allison related that, at the time, he did not know who Hubble was or that Culberg was Hubble's girlfriend.

According to Culberg, Hubble, alone, knocked on the door and Sandra let him in. Upset that Hubble had come to get Culberg, Allison raised his voice to Culberg, but Hubble put himself between them. As Hubble started yelling at Allison, Culberg grabbed the safe and threw it out the door into the yard. Allison pushed Hubble, who fell back toward Culberg, knocking her to the ground. As Hubble got back up, Allison punched him near the cheekbone. The two wrestled and Allison pinned Hubble to the ground, continuing to punch him. As Sandra ran out of the trailer, Mike ran in. Culberg pulled the flashlight out of her purse, swinging it at Allison, but he grabbed it from her mid-swing. Now armed with the flashlight, Allison starting hitting Hubble's back with it. Mike tried to take the flashlight from Allison, but Allison hit Mike's knuckles with the flashlight each time he tried to grab it. Culberg grabbed Allison's keys and cell phone from the floor and threw them in her purse. Hubble managed to escape from underneath Allison as the flashlight dropped to the floor. Mike jumped over Allison, and the two men ran out of the trailer, followed by Culberg. Culberg grabbed the safe out of the yard and took it with her.

Allison called 911. The police arrived 15 minutes later. Paramedics examined Allison because he was bleeding from the head. Detective McGinty observed "[a] laceration to the top of [Allison's] head and some sort of abrasion or scratch to the lower left shin on his leg." RP (Nov. 18, 2010) at 79. Allison found the flashlight in his trailer and turned it over to the police.[2] McGinty took custody of the flashlight when he arrived at the scene; the flashlight was later checked for fingerprints.

---

[2] Allison claims that the flashlight flew out of his hand on the last swing he took as Hubble ran out the door.

II. PROCEDURAL BACKGROUND

The State charged Hubble with first degree robbery. At the start of Hubble's jury trial, the court noted for the record that "we've had a pretrial conference, there will be one alternate [juror], looks like we're set up for that. No need to sequester the jury. Witnesses will be excluded with the exception of obviously the defendant and the state's chief investigating officer who is [Detective McGinty]." RP (Nov. 18, 2010) at 3.

The trial court then heard Hubble's and the State's motions in limine. The parties agreed to enter a stipulation that Hubble's fingerprints were found on the batteries inside the Maglite flashlight that Hubble allegedly used to hit Allison on the head.[3] Responding to the State's motion "to preclude any inquiry into whether the state's witness, Jeremy Allison, has ever ingested, possessed, or sold any type of controlled substance," the court noted that

> We had a discussion about this in chambers, and apparently there is some evidence to be presented by the defense that on the night in question, that during the relevant time period on this particular day, that Mr. Allison was involved in methamphetamine use with one of the defense witnesses, Emerald Culberg.

RP (Nov. 18, 2010) at 14-15. Defense counsel then explained that the evidence was relevant because it addressed Allison's ability to perceive and recall the events of the alleged robbery. The prosecutor conceded the evidence's relevance on that point, clarifying that the State objected to admitting evidence of Allison's drug use outside that date as a form of character assassination.

---

[3] After McGinty's testimony, the defense read the stipulation into the record. It stated:

> Stipulation, Jacob Hubble hereby stipulates that the Lewis County Sheriff's Office retrieved a D cell mag light flashlight on August 9th, 2010 from Jeremy Allison. Law enforcement attempted to lift fingerprints from the outside of the flashlight and no prints were found. Fingerprints were found on the batteries inside of the mag light that matched those of Jacob Hubble.

RP (Nov. 18, 2010) at 83-84.

4

The court then made its ruling, "grant[ing] the motion [to exclude] anything that's not concerned with the events of . . . August 9th of 2010." RP (Nov. 18, 2010) at 16.

After the jury heard all the evidence and was dismissed for the day, the court invited counsel into chambers to talk about jury instructions. The following morning, the court noted that the "[r]ecord should reflect we had a jury instruction conference last night and came up with a set of jury instructions." RP (Nov. 19, 2010) at 3. Over the State's objection, the court then accepted the defense's additional instruction regarding evidentiary limitation on prior inconsistent statements. The court instructed the jury, including instructions on accomplice liability and the defendant's right to remain silent.[4]

In closing argument, the defense argued that the State's failure to locate eyewitnesses Mike and Sandra and to obtain evidence from them left holes in the State's case. The prosecutor directed his first words in rebuttal toward this argument:

> Ladies and gentlemen, the implication that the state did not take this case seriously or that we did not do our job in trying to prosecute this matter effectively is frankly offensive because we did all we could with what we had.
> Who is Mike? Maybe we don't know who Mike is. Maybe the defendant didn't want to cough him up.

RP (Nov. 19, 2010) at 27. Here, the defense made an objection that the court overruled. The prosecutor continued:

> Maybe the defendant didn't want to cough him up. Maybe Emerald Culberg didn't want to implicate her friend, her associate, and tell law enforcement who he really was. Maybe Sandra is in Mexico. Maybe we can't find these people. Maybe we have no idea where they are. We're looking for them doesn't mean we have them, doesn't mean we have their statements.

RP (Nov. 19, 2010) at 27-28.

---

[4] This instruction against self-incrimination stated: "The defendant is not compelled to testify, and the fact that the defendant has not testified cannot be used to infer guilt and should not prejudice him in any way." Clerk's Papers (CP) at 50.

5

The jury found Hubble guilty of first degree robbery. He received a sentence of 168 months. Hubble timely appeals his conviction.

## ANALYSIS

### I. PUBLIC TRIAL RIGHT

Hubble contends that the trial court violated his constitutionally protected right to a public trial when, in chambers, it (1) selected, with the parties' agreement, an alternate juror; (2) discussed the State's motion in limine with counsel; and (3) discussed jury instructions with counsel. Because none of these proceedings has historically implicated the public trial right, and because public access plays a minimal role in the functioning of these proceedings, Hubble's argument is unpersuasive.

Whether the trial court violated the defendant's right to a public trial is a question of law that we review de novo. *State v. Sublett*, 176 Wn.2d 58, 70, 292 P.3d 715 (2012). Article I, section 22 of the Washington State Constitution and the Sixth Amendment to the United States Constitution give criminal defendants the right to a public trial by an impartial jury. *Sublett*, 176 Wn.2d at 70-71. "[T]he right to a public trial serves to ensure a fair trial, to remind the prosecutor and judge of their responsibility to the accused and the importance of their functions, to encourage witnesses to come forward, and to discourage perjury." *Sublett*, 176 Wn.2d at 72.

We apply the experience and logic test to determine whether the public trial right attaches to a particular trial proceeding. *Sublett*, 176 Wn.2d at 72-73. This test consists of two prongs. First, the experience prong asks "'whether the place and process have historically been open to the press and general public.'" *Sublett*, 176 Wn.2d at 73 (quoting *Press-Enterprise Co. v Superior Court*, 478 U.S. 1, 8, 106 S. Ct. 2735, 92 L. Ed. 2d 1 (1986). Second, the logic prong asks "'whether public access plays a significant positive role in the functioning of the particular

6

process in question.'" *Sublett*, 176 Wn.2d at 73 (quoting *Press-Enterprise*, 478 U.S. at 8). Unless the answer to both prongs is yes, the public trial right does not attach to the particular proceeding. *Sublett*, 176 Wn.2d at 73.

Hubble has not argued that proceedings like the in-chambers motion in limine discussion and the in-chambers jury instruction conference have historically been held in open court, and we know of no such history. *See Sublett*, 176 Wn.2d at 75. Because neither of these proceedings satisfies the experience prong of the experience and logic test, it is unnecessary for us to reach the logic prong.

Hubble's claim that his public trial right was violated during the in-chambers conference where it was decided that an alternate juror would be seated also fails under the experience prong. Hubble has not identified any case holding that an in-chambers decision to have an alternate juror is a closure or violates a defendant's constitutional rights.[5] *See Sublett*, 176 Wn.2d at 75. Determining whether to have an alternate juror is a discretionary decision for the trial court that historically has not necessarily been conducted in an open courtroom. Hubble's claim that his public trial right was violated is unpersuasive.

II.    PROSECUTOR'S COMMENT ABOUT A MISSING WITNESS

Hubble contends that when the prosecutor argued that a potential witness, Mike, was unavailable because "[m]aybe the defendant didn't want to cough him up," the prosecutor violated Hubble's privilege against self-incrimination. Br. of Appellant at 11. We disagree. The prosecutor's comments here were in response to the defense's charge that the State had failed to

---

[5] Indeed, in the supplemental briefing that we requested from the parties on this issue, Hubble again alleges that the in-chambers discussions on admissible evidence and jury instructions were proceedings that implicated the public trial right, but fails altogether to mention this alternate-juror proceeding, much less to affirm that it too was subject to the public trial right.

produce Mike as a witness. Because Mike was peculiarly within the defense's power to produce and his testimony probably would have helped the defense's case, the prosecutor's comment was not improper, especially as a response to an issue the defense first raised.

A prosecutor cannot comment on the lack of evidence the defense presented because the defendant has no duty to present evidence. *State v. Cheatam*, 150 Wn.2d 626, 652, 81 P.3d 830 (2003). But Washington courts have adopted the missing-witness doctrine as an exception to this general rule. *State v. Blair*, 117 Wn.2d 479, 485-86, 816 P.2d 718 (1991). The missing-witness doctrine allows a prosecutor to comment on a defendant's failure to produce a witness if the absent witness is peculiarly available to the defense and would naturally be in his interest to produce. *Blair*, 117 Wn.2d at 490-91. A witness is available to the defense if he is peculiarly within the party's power to produce, the testimony concerns a matter of importance as opposed to a trivial matter, the evidence is not merely cumulative, the witness's absence is not otherwise explained, the witness is not incompetent or his testimony privileged, and the testimony does not infringe on the defendant's constitutional rights. *Cheatam*, 150 Wn.2d at 652-53. The missing-witness doctrine also does not apply where the missing witness's testimony, if favorable to the party who naturally would have called the witness, would necessarily be self-incriminatory. *Blair*, 117 Wn.2d at 489-90.

In closing argument, the defense pointed to Mike's and Sandra's absence to argue that the State had not met its burden of proof:

> I ask you, there should be questions that you have related to this evidence. Where's Mike. Who's Mike. What investigation was done to locate Mike, an eye witness to the crime. I didn't hear anything from the state. And that should be a question because you know what, no doubt Mike would be able to shed some light on what happened here. Where's Sandra. What investigation did they do to try to find her? What did they do to get a statement from her, to track her down. I

didn't hear anything. And you should be wondering why didn't the state provide me this crucial evidence, eye witness evidence to fill the holes.

RP (Nov. 19, 2010) at 19. The prosecutor responded to the issue of these missing witnesses on rebuttal:

> Ladies and gentlemen, the implication that the state did not take this case seriously or that we did not do our job in trying to prosecute this matter effectively is frankly offensive because we did all we could with what we had.
> Who is Mike? Maybe we don't know who Mike is. Maybe the defendant didn't want to cough him up.
> [Here, defense makes an objection the court overrules.]
> Maybe the defendant didn't want to cough him up. Maybe Emerald Culberg didn't want to implicate her friend, her associate, and tell law enforcement who he really was. Maybe Sandra is in Mexico. Maybe we can't find these people. Maybe we have no idea where they are. We're looking for them doesn't mean we have them, doesn't mean we have their statements.

RP (Nov. 19, 2010) at 27-28.

The defense singles out the prosecutor's response on rebuttal that "[m]aybe the defendant didn't want to cough him up," as a violation of Hubble's right against self-incrimination. RP (Nov. 19, 2010) at 27. The defense's claim, however, makes the dubious assumption that the State would have called Mike as a witness because his testimony would have strengthened its case. But it seems more likely that Mike, as Hubble's associate, would have corroborated Culberg's account of events, and would have done so without incriminating himself;[6] Mike's testimony would have reinforced the evidence that Allison had been the aggressor and that

---

[6] In rebuttal, the prosecutor predicted that if Mike and Sandra had provided evidence, that evidence would not have been self-incriminating:

> And what if they did make statements. What kinds of things do you think would be in their statement. The same kind of self-serving, I don't want to get into trouble, I just want to save my own skin statements that were in Emerald Culberg's statement when she talked to law enforcement when she wasn't charged with this offense.

RP (Nov. 19, 2010) at 28.

9

Culberg had stolen the property. As each side at trial called only one witness, Mike's testimony would not have been merely cumulative, nor would it have been on trivial matters. In sum, it appears that it would have been in Hubble's best interest, and not the State's, to produce Mike as a witness.

Furthermore, it appears that Mike was peculiarly available to the defense. The prosecutor noted that the State was looking for him but had not located him yet, and the defense offered no other explanation for his absence. Given that Hubble knew Mike, and that Allison did not know him beyond his short interaction with him on that August morning, the defense was in a unique position to produce Mike so he could offer evidence relevant to the case. Thus, when the defense first pointed out in closing argument that Mike's absence left holes in the State's case, the prosecutor's comments in reply—including the comment about Hubble not wanting to produce Mike—were proper under the missing-witness doctrine.

III. WASHINGTON'S ACCOMPLICE LIABILITY STATUTE IS NOT OVERBROAD

Hubble argues that Washington's accomplice liability statute, RCW 9A.08.020, is unconstitutionally overbroad. Under this statute, a person is guilty as an accomplice if "[w]ith knowledge that it will promote or facilitate the commission of the crime, he or she . . . [a]ids or agrees to aid such other person in planning or committing it." RCW 9A.08.020(3)(a)(ii).

Hubble argues that the definition of "aid" in the Washington pattern jury instruction for accomplice liability, by including assistance given by words or encouragement, criminalizes a vast amount of speech that the First Amendment protects.[7]

We rejected this same challenge in *State v. Ferguson*, 164 Wn. App. 370, 375-76, 264 P.3d 575 (2011) (citing *State v. Coleman*, 155 Wn. App. 951, 960-61, 231 P.3d 212 (2010)). Hubble acknowledges *Ferguson* and *Coleman*, but argues that the courts decided them incorrectly—and should therefore reconsider them—because the courts' reliance on the mens rea requirement does not meet the federal standard *Brandenburg v. Ohio* imposed: The First Amendment protects speech advocating criminal activity unless it "is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." 395 U.S. 444, 447, 89 S. Ct. 1827, 23 L. Ed. 2d 430 (1969). But in *Ferguson*, this court addressed the *Brandenburg* standard, concluding that "[b]ecause the [accomplice liability] statute's language forbids advocacy directed at and likely to incite or produce imminent lawless action, it does not forbid the mere advocacy of law violation that is protected under the holding of *Brandenburg*." 164 Wn. App. at 376. We once again reject this constitutional challenge.

---

[7] The instruction for accomplice liability defines "aid" as

> all assistance whether given by words, acts, encouragement, support, or presence. A person who is present at the scene and ready to assist by his or her presence is aiding in the commission of the crime. However, more than mere presence and knowledge of the criminal activity of another must be shown to establish that a person present is an accomplice.

11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 10.51, at 217 (3d ed. 2008).

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Penoyar, J.

We concur:

_____
Van Deren, J.

_____
Worswick, C.J.